[Civ. No. 34085. Second Dist., Div. One. June 10, 1970.]

MARJORIE GARRETTE MANDANIS, Plaintiff and Appellant, v. GEORGE PETER MANDANIS, Defendant and Respondent.

COUNSEL

Ephraim Margolin for Plaintiff and Appellant.

John M. Sink for Defendant and Respondent.

OPINION

LILLIE, Acting P. J.—The parties entered into a property settlement agreement on June 1, 1960; the interlocutory judgment of divorce was entered July 6, 1960, and the final, one year later. The interlocutory decree approved the property settlement agreement, ordered defendant to pay plaintiff for her support the sums provided in paragraph 9 of the agreement and determined the payments under paragraph 9 to be an inseparable and indivisible part of the consideration for a property settlement and not to constitute a severable provision for alimony, and such support payments shall not be increased regardless of a change of circumstances. No appeal was taken from the judgment.

Paragraph 9 of the property settlement agreement is a complex provision fixing support payments to plaintiff in different amounts under varying circumstances; insofar as it is here material defendant was obliged to pay plaintiff $235.97 per month (Par. 9-B-(1)), but should plaintiff earn income in excess of $250 per month the payments shall be reduced by any amount in excess of $250 per month, computed on a monthly basis. (Par. 9-B-(4).) Late in 1960 plaintiff started work for the Santa Barbara Probation Department and in 1963 moved to San Mateo where she earned from $549 to $767 per month; for 34 months—from June 1963 through March 1966—she was earning sufficient that no longer was she entitled to receive any support under paragraph 9. On March 21, 1966, defendant wrote to plaintiff stating that he had become aware that she had been earning in

excess of the figure entitling her to support payments under the agreement and that while he would pay for April to give her time to adjust her budget, beginning with May 1966 no further payments would be made. Within a month plaintiff began to experience physical symptoms which she claims forced her to give up her job, and she is now attending law school part time. Thus, on April 21, 1967, plaintiff brought an order to show cause to modify her support payments (increase from $235.97 to $350 a month) and those of the minor child, Gregory (increase from $75 to $200 a month) and, to avoid the provisions and limitations of the property settlement agreement, charged in connection therewith that defendant, his lawyer and her own lawyer had all been guilty of fraud and collusion seven years before. On May 8, 1967, defendant filed his order to show cause for an accounting of support payments plaintiff had received with knowledge that she was not entitled to the same, with a corresponding offset against any future payments. After a three-day hearing at which some 39 exhibits were received, including depositions of plaintiff and the auditor of San Mateo County (plaintiff's employer), the court denied all relief sought by plaintiff. In its order the trial court determined the property settlement agreement to be an integrated agreement not subject to modification (except for child support), entered into by plaintiff freely, fully advised and represented by counsel of her own choice, and free of fraud, misrepresentation, collusion or other misconduct on the part of defendant, defendant's lawyer or plaintiff's own lawyer, and the support provision for plaintiff in the property settlement agreement (Par. 9) to be subject to reduction but not to increase; allowed defendant an offset of $8,022.98 with interest thereon at 7 percent against future support payments for the 34 payments plaintiff had received with knowledge she was not entitled to them; and ordered that "continuation of the present level of child support payments, of $75.00 per month, is in the best interests of the child, and is fair, equitable and reasonable under present circumstances." Plaintiff appeals from the order.

Respondent devotes a considerable part of his brief to a refutation of any wrongdoing or fraud perpetrated on plaintiff by him, his attorney or plaintiff's attorney when the property settlement was entered into in 1960, but this is not in issue here for appellant concedes that she failed to prove her allegations of fraud, misrepresentation, collusion, misconduct, etc., in the court below. Thus, the only issue is the sufficiency of the evidence to support the trial court's order.

The support provision of the property settlement agreement (Par. 9) expressly provides that "the support payments to the wife herein cannot be increased irrespective of any change in the circumstances of either husband or wife." (Par. 9-D.) The record shows that for some months

before they retained counsel the parties attempted to settle their affairs by a process of bargaining and personally negotiated the matter of alimony; defendant specifically told plaintiff he wanted to limit his liability for her support in the "upward direction." Six preliminary drafts of the agreement attest the primary importance defendant gave the matter of the support ceiling clause. Plaintiff wrote the first draft of the property settlement agreement in her own hand; it contained the words "alimony not subject to revision." The second draft which plaintiff typed contains the same wording. Plaintiff conceded that from the very outset defendant was adamant in his insistence that the ceiling clause be included; that when she signed the final agreement she knew it contained the support ceiling clause but signed the agreement because she harbored the secret opinion she could upset it later in court. She explained that this opinion was not based on anything her counsel told her; and that defendant insisted on the ceiling clause and she was unable to "budge him" but she concluded from her six months' study in law school and her work as a legal researcher that even if she signed it the court would not enforce the clause. The record shows that from the very beginning defendant insisted on the ceiling clause, bargained for it, and never wavered from it. Ultimately the final draft of property settlement agreement was prepared by plaintiff's attorney and signed by the parties and their counsel on June 1, 1960, approved on the last page in the handwriting of and by the judge on July 6, 1960, and on the same day again expressly approved by the judge in the interlocutory decree of divorce (Par. 2). In addition the interlocutory judgment ordered defendant to pay to plaintiff for her support the sums provided in paragraph 9 of the property settlement agreement; and, in accord with paragraph 9 of the property settlement agreement, "Such support payments to plaintiff may not and shall not be modified by this Court except as specifically provided in said Property Settlement Agreement and cannot and shall not be increased regardless of any change of circumstances of either party." (Par. 5.)

Further, appellant argues that the trial court erred in holding the agreement to be an integrated property settlement agreement. This matter is not properly before this court nor was it properly before the trial court even though it took upon itself the task of redetermining the issue. On July 6, 1960, at the request of plaintiff, and in the interlocutory judgment of divorce prepared by her own counsel, the superior court made "a clear and concise" determination that the property settlement agreement was integrated in character (*Puckett* v. *Puckett,* 21 Cal.2d 833, 841 [136 P.2d 1])—that "the payments to plaintiff [under the property settlement agreement (Par. 9)] are an inseparable and indivisible part of the consideration for the property settlement and do not constitute a severable

provision for alimony." No appeal was taken from this judgment and the same has long been final. Since this issue became res judicata against plaintiff when the 1960 judgment became final (*Rasmussen* v. *Rasmussen,* 275 Cal.App.2d 443, 450 [79 Cal.Rptr. 842]), we refrain from further discussion of her present claim.

■ Amply supported by substantial evidence is the trial court's determination that defendant is entitled to an offset of $8,022.98 against any future alimony. During the time here material defendant under normal circumstances was obliged, under paragraph 9, property settlement agreement, to pay plaintiff $235.97 per month for her support but should she earn income in excess of $250 per month the payment shall be reduced by the amount of excess. For 34 months, from June 1963 through March 1966, plaintiff earned more than $250 per month (from $549 to $767 per month). Appellant advances a factual argument to the end that defendant did not make the payments by mistake because he knew where she was employed and for that reason and others he must have known she was earning more than $250 per month, thus he waived his rights under the property settlement agreement to reduce her support and any right of offset. The record shows that during the 34 months defendant was not aware of the amount of plaintiff's earnings; that although he knew she was employed he did not know her salary and that he stopped making payments when he learned the truth of the situation. Further plaintiff testified that at no time did she inform defendant that her earnings had increased and she had passed the point where under the property settlement agreement she was no longer entitled to receive support payments. Whatever factual conflict on this issue arose in the evidence the trial judge resolved in favor of respondent; this court will not disturb that finding.

■ Appellant claims that at most the overpayment was for 16 months in the total amount of $3,775.53, not 34 months in the amount of $8,022.98 because the $250 maximum earning clause means $250 per month net. There is no merit to her contention for the various exhibits and evidence of their various negotiations show that by the time the property settlement agreement was finally drafted and signed by the parties they knew and intended the $250 figure in paragraph 9-B to mean $250 per month gross. The basic alimony installment of $235.97 was itself a gross figure ($200 for support and $35.97 tax). There is little doubt that plaintiff knew and intended the figure to refer to gross income for she was asked whether during the 34 months she received support payments to which she was not entitled and she answered "That's right.

Under the agreement." Again the knowledge and intentions of the parties were a factual issue resolved in favor of defendant.

■ As to the denial of an increase in child support payments, we can only conclude under the totality of the circumstances that the trial court did not abuse its discretion.

At the time of the hearing (May, November 1967) Gregory was 9 years old. By her testimony and Exhibit 3, plaintiff claimed Gregory's monthly expenses to be $304.75, consisting of $20, telephone; $10, house repairs; $25, transportation (fuel and upkeep for car); $12, books and magazines; $7.50, entertainment; $12, milk; $10, clothing; $8, doctor, dentist and drugs; $1, school; $3, YMCA; $3.50, cleaning and laundry; and $150, baby sitter. Plaintiff owns her home in San Carlos which she purchased in 1963 and on which she made $3,000 worth of improvements, owes $16,499.81 and makes monthly payments of $127; she also owns a home in Redwood City which she purchased in 1965 for $16,500 with a down payment of $3,500 and on which she owes $12,709.26, makes monthly payments of $88 and receives $145 per month rent. Between the entry of the interlocutory decree (July 6, 1960) and the final decree of divorce (July 6, 1961) and at the suggestion of plaintiff, defendant voluntarily turned over to her his undivided one-half interest (worth approximately $8,500) in the marital home in Santa Barbara which had been awarded to him as his sole and separate property. Plaintiff owns a 1962 Falcon, small checking account, two savings accounts ($350.71 and $1,023.02), $220 worth of stock and $1,000 or $2,000 in a retirement fund. During the six years after her divorce, plaintiff worked as a probation officer at one time earning approximately $900 a month; just prior to the within proceedings, plaintiff quit her job claiming ill health and is now devoting herself to her law studies. According to Dr. Westmeyer, plaintiff has fibrosities, or non-articular rheumatism, "a syndrome of pain and limitation of motion of muscles and joints"; however, he did not recommend that she quit her job, merely that she limit her active period to eight hours a day; he made no diagnosis of rheumatoid spondylitis and the X-rays were normal. According to plaintiff, her treating physician (Dr. Engleman) did not feel her condition was a terribly serious one; Dr. Wilbur, who examined her in Palo Alto, felt that her medical problems resulted from the nervous, mental and physical strain of working at a job in the daytime and going to school at night and that the solution was to diminish her work schedule. Plaintiff now works part-time in a law library and as cashier in a cafeteria and attends law school.

Defendant is remarried and supports his wife, who is not employed, and their two children, 3 years and 8 months, respectively. In 1960 he earned

a yearly gross of $14,000. Since January 1, 1966, he has worked for General Electric Tempo, engaged in business and government planning; he earns a gross yearly salary of $30,000. His testimony and Exhibit Z show his net monthly income to be approximately $1,381.70 and his monthly expenses $1,505.01, the excess, defendant says, he meets out of his savings (savings plan arranged by employer) from time to time. From his gross pay are deducted federal withholding, G. E. pension plan, employee life and medical insurance, dependent medical insurance, savings and security plan, Elfun Trust purchases and long term disability insurance. His monthly expenses consist of $475, rent for a single family dwelling including water and gardening; $212, groceries and household expenses; $108, clothing and personal car expenses; $199.88 transportation (capital cost $98 based on 5-year car life, $76.66 operations cost [tires, gas, repairs], licenses, $5.22, insurance, $20); $14, house insurance; $65, medical and dental expenses; $15, laundry and cleaning; $61.75, utilities; $45.60, vacation and amusement expenses; $35, professional books, journals, magazines and newspapers; $25, contributions; $5, membership dues; $19.10, books and toys for children, including Gregory; $17, entertainment, including business connected; $33.85, boat: insurance, mooring, taxes; $70.83, gifts (including $400 per year for parents' travel expenses to and from South Carolina); and $103 for support of Gregory (in addition to the $75 per month cash defendant pays to plaintiff under the property settlement agreement for Gregory's support, he buys monthly approximately $28 worth of clothing, books and personal items, including summer camp and travel expenses). As to where defendant resides and some of his expenses, they are directly related to his job; "Clearly in my present position I report directly to the head of Tempo, and aspects of these expenses are business connected in the sense that I entertain and I am not reimbursed for those expenses. In my—the quality of my residence in a very definite, even though indirect way, is connected to my business obligations. I do entertain there a lot. I have visitors from the East very often." Defendant travels about once every two weeks and has business guests at the residence two or three times a month; this "very directly" goes with the job, but for these expenses against his current income he is not reimbursed. While there is legitimate concern for the necessity of boat expenses and travel expenses for his parents, the bulk of defendant's living expenses in the light of his family obligations and the demands of his job appears to be reasonable.

Solely on the basis of defendant's $30,000 gross annual salary one might well conclude that defendant could reasonably pay more than $103 per month for the support of his 9-year-old son. However, there is a stunning factor that places defendant's income and expenses in proper perspective. The $75 per month (and the additional $28) defendant pays for Gregory's support and maintenance is only part of his obligation to Gregory under

the property settlement agreement. He is also obliged thereunder to pay all of Gregory's extraordinary medical and dental expenses, maintain a $10,000 NSLI policy naming Gregory primary beneficiary until he dies, marries, becomes self-supporting or reaches 24 and provide Gregory "a reasonable college or professional education" without any limitations as to his minority, "including support, tuition and other expenses incidental thereto." This last obligation and defendant's acknowledgement thereof and willingness to assume it five or six years from now, regardless of the financial impact on his other two children, is no doubt the element that primarily impelled the trial judge to declare in his order that "continuation of the present level of child support payments, of $75.00 per month, is in the best interests of the child, and is fair, equitable and reasonable under present circumstances," and justifies his exercise of discretion in denying relief. It is clear that plaintiff contemplates a $50,000 education plan for Gregory. At the time of the hearing (1967) Gregory was 9 years old and defendant's savings were minimal; defendant must be prepared to begin these support and education payments around 1975, when Gregory reaches college age. Defendant has a good job, has made every effort to succeed therein and has been working from 8 a.m. to 7 p.m. weekdays plus weekends and some nights; he testified that these are his "good earning years." Thus if he is to honor his obligation under the property settlement agreement to provide Gregory with a college and professional education without any limitation as to his minority, including support, tuition and other expenses incidental thereto—and in consideration of defendant's past performance and fidelity in promptly making all payments under the property settlement agreement and his close family relationship with Gregory, we have every reason to believe he will—defendant must do so now and regularly set aside substantial funds for college education purposes during the next seven or eight years. In addition to the child's necessities and defendant's expenses and obligations under the property settlement agreement, the court was clearly entitled to take into account defendant's responsibilities arising from his second marriage and his obvious need to accumulate during the present and future years approximately $50,000 for Gregory's college education.

The order is affirmed.

Thompson, J., concurred.

**GUSTAFSON, J.**—I concur in the judgment and in the opinion except with respect to the order refusing to increase the amount of child support.

There are so many factors which a court may properly consider in reaching its determination whether to increase child support that the discretion of

the trial court is necessarily very broad and an abuse of discretion is therefore rare. Moreover, appellate courts, I suppose, are very reluctant to find an abuse of discretion for fear that they will be deluged with appeals from child support orders. Nonetheless, I feel that there was an abuse of discretion in this case.

As I see it, it is improper to consider the additional $28 per month which defendant in the past has paid for the child's support and maintenance. This was a voluntary payment on defendant's part and may be discontinued at any time. I think it is also improper to consider the fact that defendant may be obligated to spend a considerable amount in the future for the child's education. That obligation is subject to many contingencies including death of the child and election of the child not to attend college. Moreover, insofar as it operates after the child reaches 21 years of age, it is an obligation which the defendant voluntarily assumed by contract with plaintiff. Defendant was not obligated to undertake support of the child beyond the child's 21st birthday. The premiums on the National Service Life Insurance policy on defendant's life, which policy must be maintained with the child as beneficiary for a limited time, are so small that defendant did not even bother to include them in his listed expenses. Similarly of little significance is defendant's obligation to pay all of the child's extraordinary medical and dental expenses since, as the court observes, defendant carries "dependent medical insurance" with the premium deducted from his gross pay.

In any event, the obligations to provide the child a college education, to maintain an insurance policy for his benefit and to pay his extraordinary medical and dental expenses are exactly the same now as they were in 1960 when defendant earned $14,000 per year and the amount of child support was fixed at $75 per month. We must look to the circumstances which have changed, not to those which remain the same.

In 1960 the child was 18 months old. When the order denying an increase in child support was made the child was over 9 years old. It obviously costs more to maintain a 9-year-old boy than an 18-month-old baby. This is one change in circumstances indicating a need for more child support.

The cost of living increased appreciably from 1960 to 1968 and this is a second change of circumstances indicating a need for increased child support.

The property settlement agreement shows on its face that it was contemplated that plaintiff would obtain employment and that she would also continue her education. She did just that. She worked almost steadily from 1961 to July 1, 1967. She also attended a law school from time to time.

When plaintiff moved the court on April 21, 1967, for an order increasing child support, one basis was that her health had deteriorated and that she would be unable to work as much as she had in the past. That situation came to pass. At the time of the November 27, 1967, hearing she had been working only part time for several months and was earning about $146 per month. Throughout the opinion of this court it is intimated that plaintiff's claim that she cannot work because of her health is untrue. For example, the court states that "just prior to the within proceedings, plaintiff quit her job claiming ill health and is now devoting herself to her law studies." First, the fact is that plaintiff continued to work as long as she could and was working when these proceedings were instituted and at the first hearings (May 15 and 16, 1967). The hearings were recessed for several months and it was during that recess that plaintiff was forced to quit work. Second, the trial court, as I read its opinion and the order based thereon, did not attribute plaintiff's low earnings to any feigned illness of hers.

The trial court said: "The evidence does not show any actual increase in the need for child support except indirectly as it may result from plaintiff's present [low] earnings. This would not seem to warrant an increase in the child support payments per se." As I read the memorandum of the trial court, there is a need for increased child support resulting indirectly from plaintiff's drastically reduced income due to her inability to work full time. This means that more than $75 per month was needed to support the child and that plaintiff was making up the difference. It is obvious to me from plaintiff's statement of the child's expenses, from defendant's statement of his expenses for his family and from the minimum standards set by the State Department of Social Welfare for payments to a dependent child that $75 per month is insufficient to support a 9-year-old child.

But in addition to the three factors mentioned above clearly indicating a need for increased child support, there is no question about the ability of the defendant to pay an amount greater than $75 per month. As the opinion of the court notes, defendant is now making $16,000 per year more than he did in 1960. Granting that the trial court "was clearly entitled to take into account defendant's responsibilities arising from his second marriage," I do not think it is fair that defendant should spend, as his own figures show, an average of $350 per month for each of the four members of his present family and be obliged to pay to his child by a former marriage only $75 per month.

In *Winn* v. *Winn* (1956) 143 Cal.App.2d 184 [299 P.2d 721] the husband was earning $20,000 per year and was ordered by the trial court to pay $400 per month for the tuition of his twin 8-year-old boys in

a private school plus $50 per month "for the support and maintenance of the children for other things beside their tuition." The appellate court reversed the order for $50 per month as "an obvious and clear abuse of discretion." It was much too low. It concerns me that the judiciary in the case at bench makes the child eligible to receive welfare payments from the taxpayers when his father is earning $30,000 per year.

I would reverse the order concerning child support and remand the matter to the trial court with directions to allow each of the parties to present such further evidence going to this issue as he or she desires so that whatever order is made would be appropriate for the period from April 21, 1967, to the date of the order.

A petition for a rehearing was denied July 3, 1970.