Filed 10/23/25  Doan v. Tran CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| RICHARD DOAN,<br><br>    Plaintiff, Cross-complainant and Appellant,<br><br>v.<br><br>DEANNA TRAN, as Trustee, etc.,<br><br>    Defendant, Cross-defendant and Respondent. | F087101, F087637<br><br>(Super. Ct. No. BPB-18-003282)<br><br><br>**OPINION** |
| DEANNA TRAN, as Trustee, etc.<br><br>    Plaintiff, Cross-complainant and Appellant,<br><br>v.<br><br>RICHARD DOAN,<br><br>    Defendant, Cross-defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Kern County.  Andrew Kendall, Judge.

Van Sciver Law, Kurt D. Van Sciver; Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball, Catherine E. Bennett for Richard Doan.

Clifford & Brown, Donald C. Oldaker and Joanne L. Pierce for Deanna Tran.

-ooOoo-

This is a consolidated appeal. In the proceedings below, Richard Doan, M.D. (Doan) sought to obtain possession of five bank accounts from Deanna Tran, M.D. (Tran) because the five accounts were allegedly the property of a trust created by Doan and his late wife Tuyet Pham (Pham). The trial court determined that the five accounts were not trust assets and instead belonged to Tran. The court also denied a request by Doan to remove Tran as a co-trustee of two sub-trusts and denied a motion by Tran for attorneys' fees. Both Doan and Tran appeal the court's rulings. Doan contends that the trial court erred by finding that: (1) there was an ambiguity with respect to estate planning documents and the five accounts; (2) substantial evidence showed Pham's intent was for Tran to be the beneficiary of the five accounts; (3) he consented to his community property interest in the five accounts going to Tran; and (4) removal of Tran as a trustee was unwarranted. Tran contends that the trial court erred by finding that: (1) she was judicially estopped from seeking attorneys' fees in the capacity of a trustee; and (2) Doan's petitions were outside the scope of the no contest clause. We conclude that the court correctly denied Tran's motion for attorneys' fees and correctly found that the five accounts were owned by Tran and not the trust. However, we conclude that the court erred by finding that Doan consented to his community property interest in the five accounts going to Tran. Therefore, we affirm in part, reverse in part, and remand for further proceedings.

## FACTUAL BACKGROUND

### General Background

There are three related family groups in this case. Doan and Pham were husband and wife and had one child together, their daughter Anjolie Doan (Anjolie). Pham had three siblings: Ghia Fam (Ghia), her younger brother; Tran, her younger sister, and Mai

2.

Pham (Mai), her older sister. Doan has a brother, Toai Doan (Toai).[1] The members of these family groups are all of Vietnamese heritage. Tran and her husband are both oncologists who operate a cancer clinic in Texarkana, Texas, while Doan is an anesthesiologist in Bakersfield. Prior to her marriage to Doan, Pham had a business/accounting background.

In 2000, Pham and Doan married. They had Anjolie in 2003. Pham handled the finances for the family and for Doan's practice. Pham controlled all of the money and would open and close accounts, make distributions, pay and file taxes, and handle payroll. Pham opened a number of banking and investment accounts, some of which were in her name, some were in Doan's name, some were in the name of Doan's practice, and some were in the name of both Pham and Doan together. Pham determined how each account was opened or how each account appeared to be owned. Pham was a good records keeper who was careful with the financial affairs that she managed. Doan was somewhat familiar with how the various accounts were kept based on what Pham told him.

Around September or October 2016, Pham was diagnosed with advanced lung cancer. Pham visited a surgeon at UCLA but ultimately no surgery was recommended and she began chemotherapy treatment in Bakersfield. Doan went with Pham during the initial sessions, but Pham took herself to the remaining appointments. Chemotherapy began sometime in late 2016.

Between December 13, 2016, and January 10, 2017, Pham made changes to five savings accounts, which were all held in her own name and were all "pay-on-death accounts" (5 PODAs). Specifically, Pham made the following changes: (1) to the Union Bank account ending in 7776, named Tran as the sole beneficiary; (2) the Pacific Western

---

[1] Because the family members of Doan and Tran either have the same or similar last names, in order to avoid confusion, we will refer to the parties' family members by each family member's respective first name. No disrespect is intended.

Bank account ending in 1027, named Tran as the sole beneficiary; (3) to three JP Morgan Bank accounts ending in 8297, 6380, and 1073, added some funds, deleted Doan and Anjolie as beneficiaries, and made Tran the sole beneficiary of each account. Pham also apparently made Tran the beneficiary of a Wells Fargo bank account. The effect of Pham's actions was to make Tran the sole beneficiary of approximately $1.6 million, or a little less than 25 percent, of Doan's and Pham's total assets.

From March 2017 to May 2017, Pham underwent radiation therapy at Tran's cancer clinic in Texarkana. Upon her return from Texas, Pham contacted attorney Kevin Findley to make an estate plan. In preparation for the meeting with Findley, Pham completed a data form sent to her by Findley and compiled a list of assets. In part, the data sheet reads that all property was community property and that neither Doan nor Pham had any separate property. The asset list identified insurance policies and had categories for "saving accounts," "checking accounts," and "securities accounts." The 5 PODAs are listed as "saving accounts," but no accounts are identified as "pay-on-death accounts" and there is no indication that any accounts have a beneficiary.

In August 2017, Doan and Pham had a preliminary meeting with Findley in which their estate planning objectives were discussed. Following the meeting, draft documents were sent for Doan and Pham to review. Doan and Pham reviewed and discussed the draft documents and did not make any changes.

In September 2017, Pham's health took a turn for the worse. Pham was admitted to the hospital and had surgery to relieve pressure on her lungs. Doan witnessed the surgery and saw that one of Pham's lungs was full of cancer. Doan did not tell Pham what he saw, but what he saw instilled a sense of urgency to complete their estate planning.

In October 2017, Pham had sufficiently recovered from her September surgery, and she and Doan were able to meet with Findley to sign the estate planning documents. On October 6, 2017, Doan and Pham signed powers of attorney, pour over wills, a trust

4.

entitled the Doan-Pham Family Trust (Trust), an assignment of assets (Assignment), and an aggregate property agreement (Aggregate Agreement). Findley discussed each document before Doan and Pham signed them. The Trust provided in part that, upon the death of a spouse, the Trust would be known as the "administrative trust" (Administrative Trust). The trustee of the Administrative Trust would be the surviving spouse. The trustee of the Administrative Trust was to divide the Trust's assets into three sub-trusts: a survivor's trust (Survivor's Sub-Trust), a marital trust (Marital Sub-Trust), and a residual trust (Residual Trust) (or collectively Sub-Trusts). The surviving spouse would be the income and principal beneficiary of all Sub-Trusts during the surviving spouse's lifetime. Upon the death of Pham, Tran and Doan's brother Toai would be the co-trustees of the Marital and Residual Sub-Trusts and Doan would be the trustee of the Survivor's Sub-Trust. Doan would be entitled to regular payments of the Sub-Trusts' income and could receive payments of the Sub-Trusts' principal in the discretion of the trustees. Upon the death of Doan, the beneficiary would be Anjolie. The Trust also included Schedule A (Schedule A), which identified the initial assets of the Trust. Schedule A identified all of Doan's and Pham's property of all kinds and however held, including property to be acquired in the future, as Trust assets. However, Schedule A contained an exclusions clause that excluded all pay-on-death accounts, retirement accounts, and insurance policies (if the policies had a beneficiary other than the Trust) from the initial asset pool of the Trust. The Assignment is materially identical to Schedule A in terms of its scope and exclusions. The Assignment generally assigned all property of all kinds and however held, including property to be acquired in the future, from Pham and Doan individually to Pham and Doan as trustees of the Trust. Like Schedule A, the Assignment excludes pay-on-death accounts, retirement accounts, and certain insurance policies from the assets transferred to Doan and Pham as trustees. Finally, the Aggregate Agreement provided for a non-pro-rata distribution of community property assets of the Trust (either before or after the death of one spouse) and also provided that, upon the death of one spouse, the

5.

surviving spouse would be the sole owner of the decedent spouse's "proceeds." The Aggregate Agreement described "Wife's Proceeds" as: "At the date of this Agreement, Wife's interests in the Parties' retirement accounts are set forth on Exhibit 'A' and the life insurance policies insuring Wife's life are set forth in Exhibit 'B.' Such accounts, including any successor accounts, and any IRA or Roth IRA accounts in which Wife may have an interest at the First Death, and such life insurance policies, are hereafter referred to as 'Wife's Proceeds.' " Exhibit A of the Aggregate Agreement (Exhibit A) identified three different types of accounts owned by Doan and Pham, "checking," "saving," and "securities." The 5 PODAs are included under the "saving" accounts, although they are not identified as pay-on-death accounts and are listed as being held solely in Pham's name. The Aggregate Agreement provided that "Husband shall be designated as the primary death beneficiary of Wife's Proceeds so that, if Wife is the first spouse to die, Husband shall become sole owner of Wife's Proceeds." After the estate planning documents were signed, Findley sent an e-mail to Doan and Pham that discussed changing the named owner of any of their bank accounts.

On October 13, 2017, Doan and Pham closed two bank accounts at Chase Bank that were held in Pham's name and instead opened two new accounts in the Trust's name. Doan and Pham in effect changed the named owner of the accounts from Pham to the Trust.

From October 23, 2017, to November 5, 2017, Pham was hospitalized for pneumonia.

On November 17, 2017, Doan and Pham went to Bank of America and Wells Fargo. Pham changed the beneficiary on these accounts from Tran to the Trust. This process took several hours and greatly fatigued Pham.

On November 20, 2017, Pham was hospitalized for breathing problems. Pham was unable to leave the hospital and died on December 25, 2017. At the time of Pham's

death, no matter how any asset was titled or held, all of Doan's and Pham's assets were community property.

Following Pham's death, it was determined that Tran was the sole beneficiary of the 5 PODAs. Doan believed that it was intended for all bank accounts to become Trust assets, but the banks refused to release any funds to him. Doan requested that Tran give the money to the Trust, but Tran refused because she believed that it was Pham's intent for her to keep the money.

Findley sent a letter to Tran informing her that it was Pham's intent that all assets become Trust assets. Findley requested that Tran hand over all funds to the Trust. Tran did not do so. As a result, Doan initiated this suit to recover the 5 PODAs' funds and to remove Tran as a co-trustee. Based on Doan's briefing, the current value of the 5 PODAs is approximately $1.5 million.

### *Trial Testimony of Doan*

At trial, Doan testified in part that, sometime after Pham was diagnosed with cancer, Pham added Tran as a beneficiary to some of Pham's bank accounts. Doan and Pham spoke about adding Tran as a beneficiary. Doan testified that Pham wanted Tran listed as a beneficiary because Pham believed that they would be traveling to Los Angeles for cancer treatment, and if there was a fatal accident, Pham wanted Tran to be able to support Anjolie without having to go through a probate court proceeding and Tran would be very responsible with the money. At the time of the cancer diagnosis, Doan did not know how many financial accounts the couple had, but he believed that there were at least 10. Doan testified that he did not know on which precise accounts Tran was listed as the beneficiary and he did not know how much was in the accounts on which Tran was the beneficiary. Nevertheless, Doan agreed with Pham's decision to add Tran as the beneficiary of some of the accounts so that Anjolie would be taken care of, and he was aware that Pham made changes to some accounts between late 2016 and early 2017. It was not until mid-2018, when Tran said that she would not transfer the funds from the

7.

5 PODAs, that Doan had an objection to Tran being named as the beneficiary of any pay-on-death accounts. However, Doan also testified that he thought it was not until after Pham's death that he learned that Tran was the beneficiary of the 5 PODAs; but he also testified that Pham told him before she died about some of the accounts that had Tran as a beneficiary.

With respect to creating an estate plan, Doan testified that Pham contacted Findley. Doan explained that Pham received data sheets and forms from Findley, and Pham filled out those forms, including creating a document that listed the family's financial accounts and assets. Doan was aware of the documents submitted by Pham and agreed with them.

At the first meeting with Findley in August 2017, Doan testified that Pham spoke during the meeting and told Findley what she wanted done with the Trust. Doan did not recall everything that was discussed during the first meeting, but he recalled that Pham said that she wanted Tran and Toai to be trustees. Pham wanted Tran and Toai to be trustees because they were both wealthy and would not steal from Anjolie. In terms of potential trust assets, Doan testified that they discussed trust assets with Findley and that Pham wanted all of the assets that she and Doan owned to go to the Trust. Also at the initial meeting, the accounts on which Tran was the beneficiary were discussed. Doan testified that he brought up the subject of Tran as a beneficiary and Findley recommended changing the beneficiary to the Trust. Doan testified that Pham agreed with Findley's recommendation. After the initial meeting, Findley sent Doan and Pham draft estate documents. Pham and Doan reviewed the draft documents, discussed them, and made no changes or edits to them. At that time, Doan testified that he still did not know on which accounts Tran was the beneficiary and did not know how much money was in those accounts.

At a second meeting in October 2017, Doan and Pham went to Findley's office to sign the documents. Doan testified that Findley discussed each document before Doan

8.

and Pham signed. With respect to Schedule A, Doan testified that Findley mentioned the exclusion clause. Specifically, Doan testified that Findley said it was a standard clause, that there were some accounts that should be transferred to the Trust after a person dies for tax reasons, and if there are any pay-on-death accounts, then Pham and Doan should change the beneficiary. Similarly, Doan testified with respect to the Assignment that he understood that the exclusion for pay-on-death accounts meant any pay-on-death accounts would not be transferred into the Trust on October 6, 2017.

With respect to the Aggregate Agreement, Doan did not specifically remember what Findley said, but Doan believed that all of the assets identified on Exhibit A would go to the Trust. According to Doan, when Findley said that all of the assets listed on Exhibit A would go into the Trust, Pham agreed and did not express any disagreement. Doan testified that the Aggregate Agreement defined "proceeds" to refer to "retirement accounts," and that for some assets like retirement accounts, it was better for tax purposes they pass to the Trust after one settlor dies. Doan understood that the Aggregate Agreement allowed retirement accounts to be divided other than exactly equally between Pham and Doan in order to maximize tax benefits of the Trust. Doan agreed that not all of the accounts listed on Exhibit A were retirement accounts. Specifically, Doan agreed that accounts identified as "savings" or "checking" accounts were not "retirement accounts." However, Doan testified that accounts with T. Rowe Price, Vanguard, and Schwab, which were listed under "securities," were retirement accounts. Nevertheless, Doan believed that all accounts listed on Exhibit A would go to the Trust. Doan testified it was not his understanding that the Aggregate Agreement did not transfer anything to the Trust. Doan also denied having an agreement with Pham whereby she could do whatever she wanted with 25 percent of the family money.

Finally, Doan testified that he discussed Tran being the beneficiary of the pay-on-death accounts with Findley. Doan testified that Findley told them to go to the banks and change the beneficiary to the Trust. According to Doan, Pham nodded "yes" and

9.

expressed agreement with what Findley said. After the meeting, Findley e-mailed Pham and Doan recommendations on how to change beneficiaries of financial accounts.

After signing the estate documents, Doan testified that he and Pham made efforts to change the ownership or beneficiaries on various bank accounts. Doan testified that he had taken steps to determine which accounts had Tran as the beneficiary. However, Doan never discussed any pay-on-death accounts with Tran prior to Pham's death.

On October 19, 2017, Doan and Pham consolidated accounts at Chase Bank into an account held by the Trust. Doan testified that they attempted to change Pham's accounts at JP Morgan Bank but were unable to do so without an appointment.[2] Doan testified that Pham's health prevented them from changing any other accounts until November 17, 2017.

On November 17, 2017, Pham and Doan made the Trust the beneficiary on accounts at Wells Fargo and Bank of America. Doan testified that he and Pham had planned to go to a third bank, Union Bank, but that bank was closed by the time they were done with the other banks and Pham was too tired. According to Doan, when he and Pham returned home, he told Ghia that they had been changing the beneficiary of various bank accounts from Tran to the Trust. Doan testified Ghia told him not to worry because if Tran received any money, she would write a check and give the money back to Doan. Because of Pham's health, Doan and Pham were unable to go to any other banks before Pham's death.

Doan testified that, sometime before she died, Pham told him which accounts had Tran as the beneficiary. However, Doan's testimony was somewhat unclear as to the specific accounts that Pham told him about or how accurate the information was, and

---

**2** Jason Jensen, an employee of JP Morgan Bank, testified that, if someone wanted to make a change to either an investment account or a bank account, a representative could make the change on the spot if a representative was available. If a representative was unavailable, an appointment could usually be scheduled within a week.

Doan testified that he believed that some of Pham's accounts were held by the Trust when they actually were not.

### *Trial Testimony of Tran*

Tran in part testified that Pham did not discuss the terms or assets of the Trust with her. However, Pham did talk to Tran about being the beneficiary of some bank accounts. Tran testified that Pham had told her that she had been able to put aside money in her own name and that she (Pham) had an agreement with Doan that 75 percent of the money was "family money" and 25 percent of the money was Pham's. This division of money was agreed to in case Doan left Pham or Pham left Doan. Further, long before 2016, Pham began talking to Tran about being the beneficiary, but Pham did not tell Tran how much money would be involved. About five years before her death, Pham also would periodically mail Tran lists of Pham's bank accounts. Tran testified that the lists Pham would send her grew over time. Pham told Tran that Tran could use the funds to do whatever she thought appropriate, including charity, and to help Anjolie if, around age 45, Anjolie did not have enough money, and to help Doan if he had used up all his assets. However, Tran testified that Pham viewed the money as something that had been hard to earn and that Pham was protecting the money from other people, particularly Doan. Tran explained that, during her last days, Pham said that Doan had cheated her all her life and that he did not have her in his heart. Pham did not want Doan spending the money that she had worked so hard to earn on another person. While Pham was receiving radiation therapy in Texarkana from Tran's husband (March to May 2017), Pham would tell Tran about Doan trying to get her money or an interest in a medical malpractice suit in which she was a plaintiff.

On March 14, 2017, Tran made a "To Do" list, which were notes she had taken about some of Pham's concerns and wishes for the future. The second item on the notes dealt with finances. The notes indicated that Pham was entitled to 25 percent of the family money, while Doan and Anjolie were entitled to the remaining 75 percent. Tran

testified that Pham intended to leave with 25 percent of the family money once Anjolie either went to boarding school or to college. Tran stated that Pham wanted to create two trusts, one for Doan with 37.5 percent of the family money, and one for Anjolie with 37.5 percent of the family money. Pham's own 25 percent would be outside of these trusts and Pham could do anything she wanted with that money. The notes indicated that Pham wanted Tran and Toai to be trustees.

Tran testified that she regularly spoke to Pham after Pham returned to Bakersfield from Texarkana and up until the time of Pham's death. During those conversations, Pham did not indicate that she had changed her desires with respect to the accounts that listed Tran as a beneficiary, rather, she continued to indicate that she wished Tran to have the money. Pham also told Tran that she was working on a trust and was waiting on the draft documents. However, Pham never told Tran that she had completed or signed the Trust.

Tran testified that she received an updated list of bank accounts on November 21, 2017. The list had been overnighted. Tran called Pham, and Pham informed her that the list was an updated list of bank accounts. Pham told Tran that she was sending her an updated list because Doan had emptied some bank accounts. Tran testified that Pham told her that "it" had taken between $400,000 and $500,000 of her money. "It" was said in Vietnamese and referred to Doan. The word "it" in Vietnamese is neither masculine nor feminine and refers to animals, things, or something low class; when referring to a person, it is very insulting.

Tran also testified about her personal beliefs regarding Doan. Tran testified that she believed Doan withheld medical treatment from Pham in order to attempt to get Pham to make changes to the 5 PODAs. Tran testified that she believed Doan had an affair in the mid-2000's and in November 2017. Tran also testified that it was possible that Doan had molested Anjolie, but, although the family contemplated doing so, they did not contact the police. Tran also admitted that, in the course of texting Toai about the

5 PODAs, she said that she would reveal some "ugly truths" about Doan if she were forced; the possibility of Doan molesting Anjolie was one of those "ugly truths." Tran testified that she was "indifferent" towards Doan, but that her indifference towards him would not affect her ability to be a trustee. Although she had not yet read the Trust, Tran indicated that she would be able to make the mandatory payments of Sub-Trust income to Doan and that her feelings towards Doan would not interfere with decisions about making discretionary distributions. Tran further testified that, if there was a conflict between the terms of the Trust and the notes of March 14, 2017, concerning "finances," Tran would follow the Trust.

### *Trial Testimony of Findley*

Findley testified that Pham contacted him for estate planning. In preparation for an initial meeting, Findley sent Pham a data sheet for her and Doan to complete. After the data sheet was returned, Findley met with Doan and Pham in August 2017, where they discussed estate planning objectives and began the estate planning process. Findley testified Pham did most of the talking and Doan was very deferential; whatever Pham wanted was fine with Doan. All of Doan's and Pham's property was represented to be community property and no separate property was identified or discussed. Findley testified that Pham wanted to be sure that the Trust applied to all of the assets because of Pham's concern for Anjolie. To ensure that Anjolie would be benefited by the Trust, Tran and Toai were designed to be the co-trustees of the Marital and Residual Sub-Trusts. At first, Pham wanted only Tran to be a trustee, but it was eventually agreed that Tran and Toai would be co-trustees. The Trust also provided that periodic payments would be made only to Doan, but that Anjolie would be entitled to payments/assets when Doan died. Findley testified that Pham expected that Doan would remarry and that she would find him a second wife, but she was concerned about a second wife obtaining assets at the expense of Anjolie. During this meeting, Findley did not remember any

13.

discussion about pay-on-death accounts. Following the meeting, Findley sent draft documents to Pham and Doan.

No changes were made to the draft documents, and Pham and Doan returned on October 6, 2017, to sign all of the estate planning documents. The entire signing process took between one and one and a half hours. During the signing meeting, there was no discussion regarding pay-on-death accounts with Tran as the beneficiary. In fact, Findley had no recollection of discussing Tran as a beneficiary of any pay-on-death accounts at any meeting. However, Findley did communicate the importance of making changes to the ownership of any assets so that the assets would be owned by the Trust and that questions or litigation about certain assets could be avoided. If Pham had said that Tran was a beneficiary on a pay-on-death account, and that Pham wanted the account to be in the Trust, Findley stated that he would have advised Pham to arrange with the bank to change the beneficiary, transfer the account into the Trust, or both.

With respect to the Aggregate Agreement, Findley testified that this document was primarily directed at retirement accounts and was created for tax purposes in light of the tax laws that existed at the time. However, Findley did not recall either Doan or Pham specifically identifying which accounts were considered to be retirement accounts. Findley explained that, after one spouse died, in order to allocate assets within the Trust on the basis of all assets, including assets held outside of the Trust, the Aggregate Agreement was needed; otherwise, the Trust assets would be allocated without regard to assets held outside of the Trust. The Aggregate Agreement attempted to deal with how assets were organized outside the Trust, so that all assets were treated as one pool and then the assets within the Trust could be divided based upon that single asset pool. At no meeting did Pham refer to accounts that were her own and that were going to pass outside the Trust. The Aggregate Agreement did not define the assets that were to go into the Trust. The Aggregate Agreement also had Exhibit A attached to it, which was a list of accounts that was provided to Findley from Pham and Doan. Findley stated that as a

14.

general rule, assets like the checking accounts listed on Exhibit A would be transferred into the name of a trust itself. Further, in light of correspondence that Findley had sent on October 6 and October 13, 2017, regarding how to change ownership or title of various bank accounts, there was an expectation that at least some of the accounts listed in Exhibit A would be transferred directly to the Trust.

Findley also discussed that the purpose of Schedule A was to confirm the assets that would be held by the Trust before the assets were actually transferred into the Trust. Some types of assets on Schedule A were expressly excluded from transfer into the Trust, including pay-on-death accounts, because such assets are generally outside of trusts or excluded for tax reasons. Some of the excluded assets also may be excluded when there is a desire to pass an asset to someone who is not a beneficiary of a trust.

### Trial Testimony of Ghia

Ghia testified in part that he was 12 years younger than Pham and was closest to Pham because she viewed him like a son. Ghia visited Pham shortly after the cancer diagnosis in October 2016. At Pham's request, Ghia also traveled to Texarkana in May 2017 to learn her routines and how to care for her. He then traveled back to Bakersfield with Pham to help care for her and to try and make sure that Doan would not talk about money with her. Ghia stayed with Pham and Doan from May 2017 to August 2017 to help care for Pham. While Ghia was in Texas, he testified that Pham told him that she was leaving money to Tran, but she did not say how much money she was leaving or where the money was located, and she did not say anything about the Trust.

Ghia returned to Bakersfield in late October/early November 2017. In early November 2017, Pham mentioned "a couple of times" to Ghia that she would leave money for Tran. Ghia was unaware that Pham and Doan had created the Trust.

Ghia recalled that on November 17, 2017, the day that Doan and Pham had changed beneficiaries on some of Pham's accounts, Pham came home and was very tired and out of breath. Ghia asked Doan what or why he had taken Pham, and Doan just

15.

laughed. Doan and Pham had left for the bank when Ghia had gone to Orange County. However, Ghia returned early when he received a call from the housekeeper who was hysterical and crying and asked Ghia to return home.

After November 17, 2017, Ghia did not speak to Doan very much, but did tell him that Pham wanted to go to the hospital. Ghia explained that Pham's condition continued to deteriorate and, because she asked him to do so, Ghia and the housekeeper took her to the hospital on November 20, 2017. Pham was admitted after "maybe 30 minutes" from arrival and was unaware of whether Doan had made advanced efforts to admit Pham to the hospital. Ghia testified that Pham had requested that Doan take her, but when Ghia asked him to do so, Doan refused.[3] Ghia testified that after Pham was admitted to the hospital, she asked him to print a list of bank accounts. The list was on Pham's computer. Ghia printed out the list and gave it to Pham. Pham subsequently gave the list back to Ghia with a notation and asked him to overnight the list to Tran. On November 21, 2017, Ghia sent the list overnight (through Federal Express) to Tran. Tran confirmed with Ghia that she had received the list, and Ghia told Pham that Tran had the list.

Ghia testified that Pham had told him that she believed Doan was having an affair. Ghia told Tran that he believed that Doan had molested Anjolie. Ghia testified that Pham hated Doan, even though she was always cordial to him, and Pham did not want Doan to have any of her money.

### Trial Testimony of Mai

Mai testified in part that she visited Pham in October 2016, January 2017, May 2017, and November 2017. During the October visit, Pham told Mai that her marriage life was not happy and that she was sad. Mai testified that, during the January 2017 visit, Pham said that she had some savings and would like to give or had given those savings to

---

[3] We note that Doan testified he assisted in Pham's final hospital admission on November 20, 2017, by calling the pulmonologist and arranging for Pham to be quickly admitted.

16.

Tran. During the May 2017 visit, which was when Pham was in Texarkana receiving treatment, Pham told Mai that she was very happy in Texarkana and would like to stay there for two years. Mai testified that, during the November 2017 visit, Pham repeated that she would leave her savings to Tran. Mai explained that Pham believed that Tran would know what to do with the savings because Pham believed that Tran knew how to handle money and how to be compassionate towards others. While Pham never discussed estate planning with Mai, Pham did tell her that the Trust had been signed.

### Trial Testimony of Anjolie

In part, Anjolie testified that since Pham had passed, she had not heard from Ghia or Mai and only received yearly birthday text messages from Tran. Anjolie was unaware that Tran was claiming to be holding the 5 PODAs in part for Anjolie's benefit, and Tran has never spoken to Anjolie about the funds in the 5 PODAs. Anjolie testified that Doan absolutely did not sexually abuse her and she saw no evidence that Doan was having an affair. Anjolie opined that Doan and Pham had a very good marriage and that they loved each other.

### Trial Testimony of Nguyen

Thoa Nguyen testified that she was a good friend of Pham ever since she provided flowers for Pham and Doan's wedding. Nguyen was also a distant cousin of Doan. Nguyen testified that she and Pham would regularly talk about their children and husbands. Nguyen testified that Pham and Doan were a happy couple, there was no affair, and Anjolie was a happy child. Nguyen also testified that Pham never mentioned the possibility of Doan molesting Anjolie, and Nguyen was offended by the suggestion.

## PROCEDURAL BACKGROUND

On December 26, 2018, Doan filed a "Petition for Order Confirming Trust Ownership of Assets" under Probate Code section 850 in the Kern County Superior Court ("the Ownership Petition"). In relevant part, the Ownership Petition sought to confirm that the 5 PODAs were Trust assets. The Ownership Petition also alleged that all Trust

17.

assets were currently held by an Administrative Trust and that Doan was the trustee of the Administrative Trust.

On December 23, 2019, Doan filed a subsequent "Petition for Removal of Nominated Successor Trustee; Petition for Order of Damages Pursuant to Probate Code Section 859" (Removal Petition). The Removal Petition sought to remove Tran as the co-trustee of the Marital and Residual Sub-Trusts because Tran was allegedly inactive and impermissibly hostile towards Doan. The Removal Petition also sought to impose penalties against Tran for refusing to return the funds of the 5 PODAs.

Between November 7, 2022, and December 16, 2022, the trial court held an evidentiary hearing on the Ownership and Removal Petitions that spanned eight days. The court heard closing arguments on May 25, 2023.

On August 15, 2023, the trial court issued a written decision that denied both of Doan's petitions.

On August 29, 2023, Doan filed a request for additional decisions and clarification. On September 20, 2023, the trial court denied Doan's request.

On November 1, 2023, Doan filed a notice of appeal.

On December 1, 2023, Tran filed a motion to recover approximately $274,000 in attorneys' fees.

On January 31, 2024, the trial court denied Tran's motion.

On February 21, 2024, Tran filed a notice of appeal.

On March 21, 2024, our court consolidated Tran's appeal with Doan's appeal.

## DOAN'S APPEAL

I. **Relationship of the 5 PODAs to the Aggregate Agreement and the Trust**

A. **Parties' Arguments**

Doan argues that the trial court erroneously found an ambiguity in the Aggregate Agreement. Doan argues that the Aggregate Agreement provided that he would be the sole beneficiary of all of Pham's proceeds, which was defined to mean all of the assets

18.

identified on Exhibit A. Doan argues that the 5 PODAs are listed on Exhibit A and that Exhibit A was a document that was prepared by Pham. Doan argues that once Pham died, the Aggregate Agreement operated to make him the sole beneficiary of the 5 PODAs and to make the 5 PODAs Trust assets. Doan contends that the Aggregate Agreement and Exhibit A are clear and unambiguous, and, as a result, the court improperly considered extrinsic evidence. Additionally, Doan argues that the court erroneously interpreted the extrinsic evidence by failing to focus on the evidence of Pham's intent at the time that the estate plan was created/the Aggregate Agreement was signed. Instead, Doan argues that the court focused on evidence that pre-dated the August 2017 and October 2017 meetings with Findley. Based on the court's erroneous conclusion that the Aggregate Agreement was ambiguous, and on its failure to focus on the extrinsic evidence regarding Pham's intent at the time she signed the Aggregate Agreement, Doan argues that the court improperly denied the Ownership Petition.

Tran argues in part that the trial court correctly concluded that the Aggregate Agreement was ambiguous. Tran argues that the Aggregate Agreement references "retirement accounts," but none of the accounts on Exhibit A are identified as "retirement accounts." Rather, Tran contends that Exhibit A was a general estate planning document that listed all accounts and that it was not meant to be a list composed entirely of "retirement accounts." Tran argues that the court properly considered extrinsic evidence, including evidence regarding Pham's intent, to determine whether the 5 PODAs were "retirement accounts" for purposes of the Aggregate Agreement. Tran argues that substantial evidence, largely in the form of testimony from Pham's family members, supported the court's conclusion that the 5 PODAs were not "retirement accounts" and thus, not subject to the Aggregate Agreement.

## B. Additional Background

The trial court in its written findings concluded that the "[estate] documents create an ambiguity as to [Pham's] intent and this ambiguity will require the court to consider

and weigh the extrinsic evidence." The court found in part that the Aggregate Agreement "does not address accounts. It addresses 'Wife's Proceeds.' 'Wife's Proceeds' are defined as 'retirement accounts,' defined as the accounts on Exhibit A. As state above, Exhibit A is the list prepared by [Pham], including real and tangible property that cannot be reasonably considered retirement accounts."

With respect to Pham's intent, the trial court found:

> "[T]he court finds the extrinsic evidence shows [Pham's] long-standing plan to gift funds to her family members and the court does not find clear and convincing evidence of [Pham's] intent to change those designations through either her actions or the estate planning documents. [¶ ….¶]

> "[T]he court does not find [Doan's] testimony regarding the reason for the beneficiary designation to be credible. The court finds more credible [Tran's] testimony that [Pham] had been sending [Tran] account information for at least five years prior to [Pham's] passing. The court found very credible [Ghia's] testimony that [Pham] wanted the accounts to be printed on the last very day [*sic*] before she was admitted to the hospital, for the last time, and instructed [Ghia] to 'overnight' the account list to [Tran].

> "Dr. Doan testified that [Pham] handled all the finances and payroll. [Doan] was aware that [Pham] had control of certain accounts and did not object when [Pham] designated [Tran] as the beneficiary of the accounts. While it is possible that 'travel' to Los Angeles for treatment was part of the reason for the beneficiary designation, the evidence shows [Doan] did not provide all the information he knew about the accounts in his own testimony. In any case, on this point, the court did not find [Doan] to be credible and found [Ghia] and [Tran] to be more credible."

Based on these findings, the trial court denied the Ownership Petition.

## C. Legal Standards

The primary duty of a court in construing a trust is to give effect to the settlor's intentions. (*Barefoot v. Jennings* (2020) 8 Cal.5th 822, 826; Prob. Code, § 21102.) A trust's "construction depends upon the [settlor's] intent at the time of execution as shown by the face of the document and not on any secret wishes, desires or thoughts after the event." (*Brock v. Hall* (1949) 33 Cal.2d 885, 889; *Mummert v. Security-First National*

20.

*Bank* (1960) 183 Cal.App.2d 195, 199.)  Because the language being interpreted is that of the settlor, courts are to consider the position of the settlor and the circumstances under which the trust was made in order to determine whether the terms of the trust are clear and definite or ambiguous.  (*Estate of O'Connor* (2018) 26 Cal.App.5th 871, 878 (*O'Connor*); *Ammerman v. Callender* (2016) 245 Cal.App.4th 1058, 1073; see also *Estate of Russell* (1968) 69 Cal.2d 200, 208–210 (*Russell*).)  Courts are also to consider the entire instrument creating the trust and the trust as a whole.  (*Trolan v. Trolan* (2019) 31 Cal.App.5th 939, 948 (*Trolan*); *Morgan v. Superior Court* (2018) 23 Cal.App.5th 1026, 1039.)  Extrinsic evidence may be admitted to interpret a trust but not to give the trust a meaning to which it is not reasonably susceptible.  (*Russell*, at p. 211; *Trolan*, at p. 948.)  " 'An ambiguity in a [trust] exists when, in light of the circumstances surrounding [its execution], " 'the written language is fairly susceptible of two or more constructions.' " ' " (*Dae v. Traver* (2021) 69 Cal.App.5th 447, 466 (*Dae*); *Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1044.)  "A patent ambiguity is an uncertainty which appears on the face of the [instrument]" itself, while a "latent ambiguity is one which is not apparent on the face of the will but is disclosed by some fact collateral to it." (*Russell*, at p. 207; *Estate of Mohr* (1970) 7 Cal.App.3d 641, 646, fn. 1.)  Extrinsic evidence may be admitted to explain a patent ambiguity that appears on the face of a trust, or to identify and resolve a latent ambiguity which does not so appear.  (*Russell*, at pp. 206–207; *Estate of Dye* (2001) 92 Cal.App.4th 966, 978 (*Dye*); *Ike v. Doolittle* (1998) 61 Cal.App.4th 51, 56–57 (*Ike*).)  Whether an ambiguity actually exists is an issue of law that is subject to independent review on appeal.  (*Duran v. EmployBridge Holding Co.* (2023) 92 Cal.App.5th 59, 66; *Ike*, at p. 56.)  If the terms of a trust are free from ambiguity, then the language used must be interpreted according to its ordinary meaning and legal import and the intention of the settlor ascertained thereby.  (*Zahnleuter v. Mueller* (2023) 88 Cal.App.5th 1294, 1305 (*Zahnleuter*); *Trolan*, at p. 948.)

When the interpretation of a trust does not depend on the credibility of extrinsic evidence or on conflicts within extrinsic evidence, appellate courts review the trust de novo. (*Burch v. George* (1994) 7 Cal.4th 246, 254; *O'Connor*, *supra*, 26 Cal.App.5th at p. 878.) However, a trial court's resolution of factual conflicts within extrinsic evidence is reviewed for substantial evidence. (*Alameda County Flood Control & Water Conservation Dist. v. Department of Water Resources* (2013) 213 Cal.App.4th 1163, 1180; see also *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746–747 (*Fonstein*).) Additionally, in assessing whether substantial evidence supports a trial court's resolution of conflicting extrinsic evidence, we accept the trial court's credibility determinations. (*McCrary Construction Co. v. Metal Deck Specialists, Inc.* (2005) 133 Cal.App.4th 1528, 1536; *Schaefer's Ambulance Service v. County of San Bernardino* (1998) 68 Cal.App.4th 581, 586.) If substantial evidence supports the trial court's resolution of conflicting extrinsic evidence, and the court's resolution of the conflicting evidence in turn supports its interpretation of a trust, then the trial court's interpretation of the trust is binding on reviewing courts. (See *Fonstein*, at pp. 746–747; *Estate of Dodge* (1971) 6 Cal.3d 311, 318 (*Dodge*); *Estate of Verdisson* (1992) 4 Cal.App.4th 1127, 1136 (*Verdisson*).)

**D. Analysis**

Because the exclusionary clauses in the Assignment and Schedule A excluded retirement accounts and pay-on-death accounts, there appears to be no dispute that the 5 PODAs were not transferred to the Trust when the Trust and Assignment were signed on October 6, 2017.[4] Instead, the dispute is whether, at the time Pham died, the Aggregate Agreement and the Trust operated to make the 5 PODAs Doan's later acquired property and thus, Trust assets. In order for the 5 PODAs to be considered Trust assets, they must fall within the purview of the Aggregate Agreement through the definition of

---

[4] Given the clear language of the exclusionary clause, we agree with the parties that the 5 PODAs did not become Trust assets when the estate planning documents were signed on October 6, 2017. (*Zahnleuter*, *supra*, 88 Cal.App.5th at p. 1305.)

22.

"Wife's Proceeds." However, the trial court found an ambiguity within the definition of "Wife's Proceeds." After considering conflicting extrinsic evidence, the court found that the 5 PODAs were not part of the Aggregate Agreement and that Pham intended for the 5 PODAs to pass to Tran instead of the Trust. We detect no error in these findings.

### 1. Ambiguity

The definition of "Wife's Proceeds" refers to two categories of assets. One category is "such life insurance policies," which refers to Exhibit B and that exhibit's three listed insurance policies. The second category is "such accounts," which refers to retirement accounts that are set forth in Exhibit A. In this regard, the term "Wife's Proceeds" specifically reads that "[Pham's] interests in the Parties' retirement accounts are set forth on Exhibit A." Unlike Exhibit B which clearly contains three insurance policies, Exhibit A contains no section or category for "retirement accounts," and none of the accounts listed in Exhibit A are individually identified as "retirement accounts." Because Exhibit A contains only "saving," "checking," and "securities" accounts and does not actually or expressly identify any account as a "retirement account," we conclude that there is a patent ambiguity with the term "retirement accounts" as used by "Wife's Proceeds" in the Aggregate Agreement. (*Russell*, *supra*, 69 Cal.2d at p. 207.) In order to resolve this ambiguity, the trial court correctly considered extrinsic evidence. (*Id.* at pp. 206–207; *Dye*, *supra*, 92 Cal.App.4th at p. 978; *Ike*, *supra*, 61 Cal.App.4th at pp. 56–57.)

### 2. The 5 PODAs Are Outside of the Aggregate Agreement

There are two reasonable ways to read the term "retirement accounts" as used in the definition of "Wife's Proceeds." The term can be read to mean either that Exhibit A consists entirely of "retirement accounts," meaning that all of the accounts listed on Exhibit A are "retirement accounts;" or the term can be read to mean that Exhibit A includes, but does not consist entirely of, the family's "retirement accounts," meaning that some accounts in Exhibit A are "retirement accounts" and some are not. Under both

readings, "[Pham's] interests in the … retirement accounts" would still be "set forth on Exhibit A." The trial court determined that the latter meaning was intended based in part on its consideration of disputed extrinsic evidence. Accordingly, we review the court's resolution of the conflicting evidence for substantial evidence and also review the court's interpretation of "retirement account" for substantial evidence. (See *Fonstein*, *supra*, 17 Cal.3rd at pp. 746–747; *Dodge*, *supra*, 6 Cal.3d at p. 318; *Verdisson*, *supra*, 4 Cal.App.4th at p. 1136.) Under this review, we conclude that substantial evidence supports both the court's resolution of conflicting evidence and its interpretation of the term "retirement account."

First, Doan agreed that not all of the accounts listed were "retirement accounts." The 5 PODAs are all found under the "saving" category of Exhibit A, but Doan testified that none of the accounts in the "saving" and "checking" categories were "retirement accounts." Rather, Doan testified that some of the accounts listed in the "securities" category were "retirement accounts." Doan's testimony is significant because he is a co-settlor of the Trust and signed the Aggregate Agreement at the same time with Pham. Doan's testimony is also consistent with the general understanding that retirement accounts, in whatever form they may take, are separate and distinct from ordinary bank savings and checking accounts. (E.g. *In re Marriage of Eustice* (2015) 242 Cal.App.4th 1291, 1298 [in a marriage dissolution, one spouse listed as separate assets a checking account and a retirement account]; *In re Marriage of Ficke* (2013) 217 Cal.App.4th 10, 16 [in a marriage dissolution, one spouse identified as separate assets a savings account and a retirement fund]; *Grassilli v. Barr* (2006) 142 Cal.App.4th 1260, 1285–1286 [in a civil rights action, a police officer identified as separate assets retirement accounts and "a checking/savings account"]; *Mandanis v. Mandanis* (1970) 8 Cal.App.3d 579, 585 [in a marriage dissolution, one spouse listed as separate assets a checking account, two savings accounts, and a retirement fund].) Doan's testimony, combined with the general understanding of a "retirement account," strongly indicates that Exhibit A is composed of

a mix of "retirement accounts" and "non-retirement accounts," with the only "retirement accounts" being the securities accounts identified by Doan.

Second, Findley explained that the Aggregate Agreement created a pool of assets to be allocated within the Trust, and that pool of assets would be composed of assets initially held by/inside of the Trust and assets initially held outside of the Trust. Findley testified that ensuring that the Trust's total asset pool would ultimately include assets that were initially held outside of the Trust would maximize estate tax benefits. However, Findley also testified that there was an expectation that some of the accounts listed on Exhibit A would be transferred directly into the Trust. Accordingly, Findley's testimony indicates that some of the accounts on Exhibit A would be held by or transferred directly into the Trust. Such accounts would not be considered an asset held "outside of the Trust" and thus, would not be an asset affected by the Aggregate Agreement. As a result, Findley's testimony of necessity demonstrates that not all of the accounts listed on Exhibit A can be considered "retirement accounts."

Third, the contents of Exhibit A were created by Pham. Pham gave the list of accounts in Exhibit A to Findley in advance of the initial August 2017 estate planning meeting. There is no evidence that Pham intended for the accounts she listed on Exhibit A to be considered "retirement accounts." In fact, Findley testified that Doan and Pham did not identify any specific account as a "retirement account." Given the absence of actual identification of which accounts were "retirement accounts," as well as the fact that the accounts were made as part of an initial estate planning meeting, the trial court's characterization of the contents of Exhibit A as being "shoehorned" into the Aggregate Agreement appears accurate. Therefore, the circumstances surrounding the creation of Exhibit A do not indicate that Pham meant it to be a list composed entirely of "retirement accounts."

Fourth, Pham's siblings (Mai, Ghia, and Tran) each testified that Pham had mentioned for a number of years before October 2017 that she wanted Tran to receive, or

25.

that Tran would receive, the money that Pham had earned and saved. Pham's siblings also each testified that, in November 2017 (which obviously post-dates the October 2017 signing of the estate planning documents), Pham repeated that she wanted Tran to have her savings or would leave Tran her savings. Consistent with this evidence, Tran testified that, starting about five years before Pham's death, she had been receiving in the mail a list of bank accounts from Pham. Tran also specifically testified that in Pham's last days, Pham told her that Doan did not have Pham in his heart and Pham did not want Doan to have any of her money. Further, Tran testified that after she received the overnighted list sent by Ghia in late November 2017, Pham told her that it was the most updated list and that "it," derogatorily meaning Doan, had recently managed to take $400,000 to $500,000 of Pham's money, which appears to correspond to Doan and Pham's November 17, 2017 excursions to Bank of America and Wells Fargo. The totality of the siblings' testimony demonstrates that Pham believed: she had her own funds apart from Doan, intended for those funds to go to Tran, and did not intend for those funds to pass to the Trust. Such an intent is inconsistent with the notions that all accounts in Exhibit A were intended to be Trust assets and that Exhibit A contains only "retirement accounts."

Fifth, between December 2016 and January 2017, Pham changed the beneficiary of six accounts (including the 5 PODAs) from Doan and/or Anjolie to Tran. During the meetings with Findley in August 2017 and October 2017, Findley testified that there was no discussion by anyone about Tran as a beneficiary on any account. Further, while the evidence indicates that Doan was actively taking steps to change owners and beneficiaries of various accounts, there is no evidence that Pham engaged in similar affirmative actions to change the beneficiary of the 5 PODAs. Also, while she made no disclosures to Findley, it is unclear whether Pham ever disclosed each of the 5 PODAs to Doan as accounts that listed Tran as the beneficiary. Pham's failure to address Tran as a beneficiary, and failure to actively take steps to identify the 5 PODAs and change the beneficiary, are consistent with the testimony of Pham's siblings that Pham had a long

26.

term plan of leaving money to Tran. Pham's conduct is inconsistent with all accounts on Exhibit A, and in particular the 5 PODAs, being Trust assets or "retirement accounts."

Finally, Ghia testified that, when Pham was admitted to the hospital for the last time, she instructed him to print out a list of bank accounts and send the list overnight to Tran. The evidence also indicated that Pham's health around the end of November 2017 was very poor. The state of Pham's health, and the fact that she requested that her most recent list of bank accounts be overnighted, together can be viewed as demonstrating that Pham was aware that her condition was grim and that she wanted Tran to have the list of accounts so that Tran would know where to go to take possession of the appropriate accounts.[5]

Collectively, the above considerations constitute substantial evidence that the term "retirement account" refers to certain securities accounts on Exhibit A but not the 5 PODAs, and Pham did not intend for the 5 PODAs to become Trust assets at any time. We find particularly significant the facts that Doan testified that no savings account was a "retirement account" and that Pham continued to say and take steps consistent with Tran receiving the 5 PODAs outside of the Trust after the estate planning documents were signed on October 6, 2017. It is of course true that not all of the evidence presented was consistent with the trial court's order. For example, Doan's and Findley's testimony regarding the purpose of the estate documents and certain statements purportedly made by Pham could support a finding that Pham intended for the 5 PODAs to be Trust assets through the Aggregate Agreement. However, that is the nature of conflicting evidence. It was the court's duty to resolve the conflict, and substantial evidence supports its resolutions and conclusions. Under these circumstances, we are bound by the court's resolution of the matter. (See *Fonstein*, *supra*, 17 Cal.3rd at pp. 746–747; *Dodge*, *supra*,

---

[5] We note that the list printed out by Ghia did not accurately reflect all bank accounts. In particular, the Union Bank account, which is one of the 5 PODAs, does not appear on the printout, although the other four accounts that comprise the 5 PODAs do.

6 Cal.3d at p. 318; *Verdisson*, *supra*, 4 Cal.App.4th at p. 1136.) Therefore, because substantial evidence supports the court's resolution of conflicting evidence, and substantial evidence supports the court's findings that the 5 PODAs are not retirement accounts, were not intended to be Trust assets, and are not Trust assets, the court did not err by denying the Ownership Petition. (See *Fonstein*, at pp. 746–747; *Dodge*, at p. 318; *Verdisson*, *supra*, at p. 1136.)

## II.     Community Property Interest in the Five Bank Accounts

### A. Parties' Arguments

Doan argues in part that the trial court erred by not awarding him his 50 percent community property interest in the 5 PODAs. Doan argues that he did not consent in writing to Tran being the beneficiary of the 5 PODAs, and no evidence was presented that would support waiver, estoppel, or ratification. Doan also argues that he did not agree in writing that the 5 PODAs would be Pham's separate property.

Tran argues in part that, although the 5 PODAs are community property, Doan agreed in the Aggregate Agreement that community assets could be divided on a non-pro-rata basis. The value of the 5 PODAs is about $1.5 million, which is 19 percent of Doan's and Pham's total assets. This means that Pham designated only a fifth of the community assets. Further, Tran argues that Doan was aware of the consequences of such a designation and that Doan consented to it. For these reasons, Tran argues that Doan is precluded from seeking a 50-50 split of individual assets such as the 5 PODAs.

### B. Additional Background

In its written findings, the trial court determined that Doan was "not entitled to a community property share of the accounts because he had previously consented to [Tran] being named as the beneficiary on the accounts and never communicated any desire to withdraw that consent during the lifetime of [Pham]." The court explained that the question turned on a factual dispute between the parties about whether Doan, who at least

28.

initially consented to naming Tran as a beneficiary, withdrew his consent prior to Pham's death. In concluding that Doan did not withdraw his consent, the court explained:

> "Mr. Findley's testimony is instructive. He stated that [Doan] was very 'deferential' in the meeting pertaining to the estate planning documents. [Doan] allowed his wife to handle all the finances. The accounts themselves were not discussed during any estate planning meeting. If [Doan] was objecting to a beneficiary designation on each of the accounts he did not communicate that desire to [Pham] prior to her death. [Doan] only withdrew his consent to [Pham's] beneficiary designations on the accounts [Pham] actually changed prior to her death."

## C. Legal Standards

### 1. Community Property in General

In California, there is a statutory presumption that all property acquired during marriage is community property. (Fam. Code, § 760; *In re Marriage of Wozniak* (2020) 59 Cal.App.5th 120, 129; *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 91 (*Ciprari*).) As long as the marriage lasts, each spouse has a present, existing, and equal interest in the community property. (Fam. Code, § 751; *Ciprari*, at p. 91.) While both spouses may manage and control the community, they must act as fiduciaries towards each other in their management and control of the community property. (Fam. Code, §§ 1100, subd. (e), 1102, subd. (a); *In re Brace* (2020) 9 Cal.5th 903, 937 (*Brace*).) "Each spouse has the right of testamentary disposition over his or her half of the community property." (*Estate of Miramontes-Najera* (2004) 118 Cal.App.4th 750, 756 (*Miramontes-Najera*).)

### 2. Transmutation

During marriage, spouses may agree to change the nature of property from community property into separate property or vice versa, through a process known as transmutation. (Fam. Code, § 850, subd. (a); *Brace*, *supra*, 9 Cal.5th at p. 914; *In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1400.) In order to be valid, a transmutation must be "made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." (Fam.

Code, § 852, subd. (a); *Brace*, at pp. 912, 914; *Valli*, at p. 1400.) An "express declaration" is a writing signed by the adversely affected spouse that expressly states the character or ownership of the property at issue is being changed. (*Valli*, at p. 1400.)

### 3. *Nonconsensual Spousal Gifts*

California protects a spouse with respect to nonconsensual gifts of community property by the other spouse. (*Crosby v. HLC Properties, Ltd.* (2014) 223 Cal.App.4th 597, 609.) Family Code section 1100, subdivision (b) provides that a "spouse may not make a gift of community personal property, or dispose of community personal property for less than fair and reasonable value, without the written consent of the other spouse." (Fam. Code, § 1100, subd. (b); *Ciprari*, *supra*, 32 Cal.App.5th at p. 101.) However, the prohibition "does not apply to gifts mutually given by both spouses to third parties and to gifts given by one spouse to another." (Fam. Code, § 1100, subd. (b).) "If a spouse, after the death of [the other spouse], proves a lack of consent to a gift, [the gift] will be avoided to the extent of the nonconsenting spouse's one-half interest in the community property transferred." (*Estate of Wilson* (1986) 183 Cal.App.3d 67, 72; see also *Miramontes-Najera*, *supra*, 118 Cal.App.4th at pp. 759–760.) In the absence of a written consent, written ratification, waiver, or estoppel, the non-giving spouse may void the gift. (*In re Marriage of Stallworth* (1987) 192 Cal.App.3d 742, 753 (*Stallworth*).) Estoppel generally involves an opposing party detrimentally relying on a party's words or actions. (*Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, 475–476.) " 'Estoppel applies to prevent a person from asserting a right where his conduct or silence makes it unconscionable for him to assert it.' " (*In re Marriage of Stephenson* (1984) 162 Cal.App.3d 1057, 1072 (*Stephenson*).) "Waiver" is the " 'intentional relinquishment or abandonment of a known right.' " (*Lynch*, at p. 475.) " 'Waiver requires a voluntary act, knowingly done, with sufficient awareness of the relevant circumstances and likely consequences.' " (*Stephenson*, at p. 1072.) " 'The burden … is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the

matter to speculation, and "doubtful cases will be decided against a waiver." ' " (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31; *Stephenson*, at p. 1072.)

### D. Analysis

Initially, there is no dispute that no written document exists that was signed by Doan and that transmuted the 5 PODAs into Pham's separate property. Thus, there was no valid transmutation of the 5 PODAs. (Fam. Code, § 852, subd. (a); *Brace*, *supra*, 9 Cal.5th at pp. 912, 914.)

The trial court found that Doan had consented to Tran being named as the beneficiary on the 5 PODAs. However, the parties stipulated that all of Doan's and Pham's assets, no matter how held, were community property. This means that the 5 PODAs were community property. As community property, in order for Tran to keep the funds of the 5 PODAs as the pay-on-death beneficiary, there must either be a written consent signed by Doan or an exception to written consent, such as waiver, estoppel, a mutual gift, or written ratification. (Fam. Code, § 1100, subd. (b); *Stallworth*, *supra*, 192 Cal.App.3d at p. 753.)

As with the transmutation, there is no writing that states Doan consented to Tran being the beneficiary of any of the 5 PODAs or Tran keeping the funds of those accounts, either before or after Pham's death. (Fam. Code, § 1100, subd. (b); *Ciprari*, *supra*, 32 Cal.App.5th at p. 101; *Stallworth*, *supra*, 192 Cal.App.3d at p. 753.) Therefore, there is no written consent or written ratification. Further, the evidence does not establish that either estoppel or waiver applies to excuse the absence of writing. (*Stallworth*, at p. 753.) For purposes of estoppel, there is no evidence that Tran detrimentally relied on any statements or actions by Doan. (*Stephenson*, *supra*, 162 Cal.App.3d at p. 1072.) For purposes of waiver, we are not satisfied that the evidence sufficiently establishes that Doan was aware of the relevant consequences and circumstances with respect to Tran as a beneficiary of the 5 PODAs. (*Ibid.*) The evidence does not adequately show that: Doan knew precisely which accounts Tran was named as a beneficiary; how much money

was in the accounts; that Doan's community property interest in the account would be extinguished in the event that Doan did not predecease or die simultaneously with Pham; or that Tran could use the money for various purposes and charitable work but without helping Anjolie until Anjolie was about 45 years old. (*Ibid.*) Waiting to help Anjolie when she is 45 years old is inconsistent with the purpose of the Trust as expressed by Pham and Doan to Findley, which was to take care of Anjolie. Similarly, we cannot conclude that simply because Doan was aware that Tran was the beneficiary of some accounts that there was a mutual gift. Tran was not given any money by Pham and Doan. In fact, the evidence indicates that Doan attempted to ensure that financial accounts became Trust assets by taking Pham to change ownership of some accounts to the Trust; such actions are inconsistent with a mutual gift. Further, the evidence indicated that Pham named Tran as the beneficiary of the 5 PODAs in order to, in some capacity, help or look after Anjolie about 30 years after Pham's death and to distribute the funds for charitable work. Far from being a gift in the traditional sense of the word, the naming of Tran as a beneficiary appears to have been an attempt by Pham to establish some form of de facto trust in which Tran would distribute the funds in accordance with Pham's wishes, with some discretion for other expenditures. For these reasons, the evidence does not establish Doan's written consent or an exception to written consent. (*Stallworth*, at p. 753; *Stephenson*, at p. 1072.)

Tran argues that the Aggregate Agreement establishes that Doan and Pham agreed to forgo a traditional 50-50 split and instead agreed to a non-pro-rata disposition of all community assets. Tran argues that because Doan received about 80 percent of the community assets, he is not entitled to the roughly 19 percent of community assets represented by the 5 PODAs. We do not agree with Tran.

Although somewhat complex, the definitions within the Aggregate Agreement demonstrate that the 5 PODAs are not subject to a non-pro-rata division. The Aggregate Agreement provides for a non-pro-rata division of "Trust Community Property,"

32.

"Probate Community Property," and "Community Proceeds." "Community Proceeds" mean "both the Husband's Proceeds and the Wife's Proceeds." "Trust Community Property" means "the portion of the Community Property Estate that is held in the Trust at the First Death or that passes to the Trust by reason of the First Death, other than the Probate Community Property." "Probate Community Property" refers to "the portion of the Community Property Estate that is subject to probate at the First Death." Finally, "Community Property Estate" refers to "the Community Proceeds and all other property that is the community property of Husband and Wife at the First Death."

Applying these definitions, the 5 PODAs are community property and thus, part of the Community Property Estate. However, because they are not "retirement accounts" under Exhibit A, they are not Wife's Proceeds; and because they are not Wife's Proceeds, the 5 PODAs also are not "Community Proceeds." The 5 PODAs are also not "Trust Community Property" because they are not a portion of the "Community Property Estate" that passed to the Trust either upon its creation, sometime prior to Pham's death, or after Pham's death. This is so because, as pay-on-death savings accounts, the 5 PODAs are specifically excluded by the Assignment and Schedule A, and Pham did nothing to change the beneficiary or owner of the 5 PODAs prior to her death. Further, because the 5 PODAs are not "retirement accounts," they were not subject to transfer after Pham's death through the Aggregate Agreement (specifically through the provisions relating to Wife's Proceeds). Finally, once the owner of a pay-on-death account dies, the remaining funds in the pay-on-death account belong to the named beneficiary and are not subject to probate. (Prob. Code, § 5302, subd. (b); *Estate of Petersen* (1994) 28 Cal.App.4th 1742, 1751.) Because the 5 PODAs are not a portion of the "Community Property Estate" that is subject to probate, they are not "Probate Community Assets." Accordingly, the 5 PODA are not part of the "Trust Community Property," the "Probate Community Property," or the "Community Proceeds" under the Aggregate Agreement and thus, are not subject to a non-pro-rata division through the Aggregate Agreement.

33.

In sum, there is not a valid written consent by Doan for Tran to keep the entirety of the funds in the 5 PODAs, nor is there a valid substitute for Doan's written consent. (Fam. Code, § 1100, subd. (b); *Stallworth*, *supra*, 192 Cal.App.3d at p. 753.) Further, the 5 PODAs are not subject to a non-pro-rata division under the Aggregate Agreement. Under these circumstances, Doan is entitled to recover his 50 percent community property share of the 5 PODAs. (*Miramontes-Najera*, *supra*, 118 Cal.App.4th at pp. 759–760; *Stallworth*, at p. 753; *Estate of Wilson*, *supra*, 183 Cal.App.3d at p. 72.) The trial court erred by ruling otherwise.

III.   **Propriety of Tran as a Co-trustee**

A.   **Parties' Arguments**

Doan argues that the trial court erred by not removing Doan as a co-trustee. Doan argues that Tran is inactive because she has yet to read the Trust. Doan also contends that Tran harbors hostility towards him because she threatened to accuse him of having a years-long affair and molesting Anjolie if he did not drop his petitions. Doan argues that Tran testified that she believes he had an affair, but did not know whether he had molested Anjolie. Doan argues that Tran's inaction and hostility compels her removal.

Tran argues that the trial court correctly refused to remove her. Tran argues that Doan's request to remove her is theoretical and premature since she has not affirmatively administered a Sub-Trust. Tran also argues that Pham made a considered decision for Tran to be a person who administers two Sub-Trusts. Although she may not like or trust Doan, Tran argues there is an insufficient degree of hostility to warrant removing her.

B.   **Additional Background**

The trial court denied Doan's request to remove Tran as a co-trustee of the Marital and Residual Sub-Trusts. In denying the Removal Petition, the court noted that Tran had not yet read the Trust and had stated it was possible that Doan had molested Anjolie. However, the court found that "appointing the two co-trustees was a compromise. Initially [Pham] wanted only [Tran] to serve. The court will not upset a carefully

34.

constructed compromise on an issue so important to [Pham]. [¶…¶] Here there is simply no evidence that [Tran] has taken any action to impair the trust. Despite the ill-feelings the parties may feel toward one another, there is no evidence [Tran] cannot set these feelings aside and fulfill her fiduciary obligations as trustee."

### C. Legal Standards

If hostility, antagonism, and inevitable future conflict between a trustee and a trust beneficiary threaten to impair the proper administration of a trust, then a court may order the removal of the trustee. (See *Estate of Gilmaker* (1962) 57 Cal.2d 627, 632; *IFS Industries, Inc. v. Stephens* (1984) 159 Cal.App.3d 740, 754; *Copley v. Copley* (1981) 126 Cal.App.3d 248, 288 (*Copley*).) However, and particularly if the settlor understands or contemplates that a certain amount of friction or hostility may exist between a trustee and a beneficiary, courts will ordinarily not remove a trustee appointed by the settlor. (*Trolan*, *supra*, 31 Cal.App.5th at p. 957; *Copley*, at pp. 288–289; *In re Estate of Brown* (1937) 22 Cal.App.2d 480, 486 (*Brown*).) A court's decision regarding the removal of a trustee is reviewed for an abuse of discretion. (*Trolan*, at p. 957.) Discretion may be abused when the court's decision exceeds the bounds of reason, all circumstances before it being considered. (*In re Marriage of Melton* (1980) 107 Cal.App.3d 559, 564.)

### D. Analysis

We agree with Doan that Tran's testimony is troubling. It is concerning that Tran has not read the Trust and thus, is unaware of the express objectives of, and obligations imposed by, the Trust and associated Sub-Trusts in furtherance of the beneficiaries' interests. (Cf. *Estate of Gilmaker* (1964) 226 Cal.App.2d 658, 663 ["It cannot be said that it is the exercise of reasonable judgment to assert or defend a position for which no reasonable support can be found in the trust provisions."].) It is also concerning that

35.

Tran's testimony shows that she believes Doan is guilty of infidelity and withholding medical care from Pham and that he may possibly have molested Anjolie.[6]

Nevertheless, Tran's and Ghia's testimony suggests that Pham was aware of Doan's behavior and Tran's opinion of him. Despite this, Pham still insisted that Tran be named a co-trustee of the Marital and Residual Sub-Trusts. Indeed, Tran's notes from her discussions with Pham in March 2017 reflect that Pham wanted Tran and Toai to be trustees of two trusts (one for Doan and one for Anjolie) before Pham had ever met with an attorney. Similarly, Findley's testimony indicated that Pham initially intended that Tran be named the sole trustee, but she agreed as a compromise with Doan that Tran be one of two co-trustees for the Marital and Residual Sub-Trusts. Pham's plan and insistence that Tran be at least a co-trustee of the two Sub-Trusts demonstrates that Pham believed that she could trust Tran to act as a competent and faithful trustee towards the beneficiaries, despite any personal animus that Tran may harbor towards Doan. In other words, it is clearly inferred that Pham was aware that there would be some degree of friction and perhaps hostility between Tran and Doan, yet she still concluded that the friction and hostility would not adversely affect the administration of the Sub-Trusts. Pham's decision is entitled to considerable deference. (*Trolan*, *supra*, 31 Cal.App.5th at p. 957; *Copley*, *supra*, 126 Cal.App.3d at pp. 288–289; *Brown*, *supra*, 22 Cal.App.2d at p. 486.)

There is nothing before us that shows Pham's judgment was incorrect. Doan has pointed to no concrete acts by Tran that has damaged the Trust or Sub-Trusts or impaired their administration. Indeed, because the Martial and Residual Sub-Trusts have not yet been funded by the Administrative Trust, the Sub-Trusts do not yet exist. (Fraser et al., Drafting California Revocable Trusts (Cont.Ed.Bar September 2024 supp.) § 5.3 (DCRT) ["If a trust document is executed but no property is immediately made subject to the trust,

---

[6] We note that Anjolie, who was an adult at the time of trial, testified she saw no evidence of an affair and categorically denied that Doan had ever molested her.

36.

the trust will come into existence when the property is later transferred to the trust."].)

Thus, Tran has been unable to engage in traditional and affirmative acts of trust administration. Also, while Tran may not have read the Trust, she has not stated that she will never read it. Moreover, because they are unfunded and non-existent (*ibid.*), it is unclear how the failure to read the Trust can impair the administration of the Marital and Residual Sub-Trusts. Further, Tran responded that she could faithfully follow the Trust/Sub-Trusts when asked about specific obligations and duties that were imposed by the Trust/Sub-Trusts. Tran also testified that she would follow the Trust/Sub-Trusts even if they conflicted with her notes from her discussions with Pham in March 2017. Therefore, Doan's arguments remain theoretical and relate only to what Tran may possibly do while administering the Sub-Trusts. Without more, what Tran may possibly do is insufficient to revoke Pham's choice of Tran as a co-trustee. (See *Trolan*, *supra*, 31 Cal.App.5th at p. 957; *Copley*, *supra*, 126 Cal.App.3d at pp. 288–289; *Brown*, *supra*, 22 Cal.App.2d at p. 486.)

Accordingly, we cannot conclude that the trial court's decision to leave Tran in place as a co-trustee exceeds the bounds of reason or constitutes an abuse of discretion. (*Trolan*, *supra*, 31 Cal.App.5th at p. 957; *In re Marriage of Melton*, *supra*, 107 Cal.App.3d at p. 564.)

## TRAN'S APPEAL

### A. Parties' Arguments

Tran argues that the trial court erred by denying her motion for attorneys' fees. Tran argues that she is entitled to seek attorneys' fees under Trust Section 12.16 (Section 12.16), which provides for indemnification and reimbursement for a trustee's expenses, because she defended her role as a co-trustee. Tran argues that merely pointing out that she has not had the opportunity to engage in affirmative acts of trust administration because the Sub-Trusts were unfunded is not the same as admitting or contending that she is not a trustee. Tran also argues that she is entitled to attorneys' fees because Doan's

petitions were "contests" under Trust Section 14.12 (Section 14.12) and Trust Section 14.13 (Section 14.13). Tran argues that Doan's petitions attacked and impaired the portion of the Trust that set Tran as a co-trustee, excluded pay-on-death accounts as Trust assets, and prohibited challenges to a beneficiary designation on a financial account.

Doan argues in part that Tran defended the two petitions in her individual capacity only and, by her own admission, never actually served as a trustee. Doan contends that since Tran did not serve as a trustee or engage in acts of trust administration, Tran is not entitled to fees under Section 12.16. Doan also argues that the "no contest" provisions of the Trust do not apply. Specifically, Doan argues that the Ownership Petition falls within exclusions under Section 14.12 and the Removal Petition was proper because the Trust does not bar attempts to remove a trustee. Alternatively, Doan argues if fees are proper, Tran has not segregated fees related to the Removal Petition and has not followed the proper procedure under the Probate Code to obtain an award against the Sub-Trusts.

## B. Additional Background

Section 12.16 is entitled "Right of Indemnification and Reimbursement" and reads in relevant part:

> "A Trustee shall be entitled to indemnification from the Trust Estate of which that person serves as Trustee for any expense, loss, damage, liability, costs, or claim (including, without limitation attorney's fees and costs of litigation) incurred by the Trustee by reason of any act performed or omitted to be performed by the Trustee, acting in good faith, in the administration of the trust. The Trustee shall be deemed to have acted in good faith on behalf of the trust if the Trustee acted in a manner reasonably believed by the Trustee to be within the scope of his or her authority and in the best interest of the trust and its beneficiaries."

The Trust also contains provisions relating to "contestants" and the "expenses of contest," which includes attorneys' fees. Under Section 14.12, a "Contestant" is defined in part to mean any trust beneficiary who:

> "(1) institutes any legal proceeding that attacks or contests [the Trust] or either Settlor's Will … or seeks to impair, nullify, void, or invalidate such documents or any of their provisions; (2) asserts or pursues in any manner

38.

any claim, including any creditor's claim, against the Settlors' estates or property other than as permitted in [the Trust] and the Settlors' Wills; (3) attacks or contests or seeks to change any beneficiary designation under any insurance policy, employee benefit plan, deferred compensation plan, retirement plan, profit sharing plan, individual retirement account or individual retirement annuity, annuity, or other financial instrument or account of any kind or other Will substitute of the Settlors; or (4) conspires with or voluntarily assists any person or persons attempting to do any of these things."

Section 14.12 expressly recognizes that a surviving spouse/settlor may be a "contestant."

However, Section 14.12 also provides that its provision regarding contestants do not apply to:

"any action or proceeding brought by [the Settlors] during their lifetimes, to change the ownership, title or the character of the Settlors' property already characterized in a document signed by the Settlors (excluding any action by the Settlors' Executors or Trustees to confirm ownership of the Settlors' property in the trust or the Settlors' estates) and any challenge to the validity of an instrument, contract, agreement, beneficiary designation, or other document executed by the Settlors providing for or directing the disposition of the Settlors' property."

With respect to attorneys' fees and "expenses of contest," Section 14.13 provides in relevant part:

"[T]he Trustee serving under this Trust Agreement [is] expressly authorized to defend against any and all of the actions described in this Article, including any contest or attack of any nature upon this Trust Agreement … or any of its provisions.  All expenses incurred in the defense of any of the actions or matters described in this Article shall be paid, as the … Trustee determines from … the Truste Estate as expenses of administration.  If, however, a Contestant is or becomes entitled to receive any property or property interests included in the … Trust Estate … then all expense incurred by the Trustee or the Settlor's Executor in the defense of the actions undertaken by the Contestant shall be charged against and paid from the property or property interests that the Contestant otherwise would be entitled to receive, whether or not the Trustee … was successful in the defense of the Contestant's actions.  For purposes of the foregoing, expenses shall include attorneys' fees and costs, including those incurred in prelitigation costs, in bringing such suit and/or enforcing any judgment."

**C. Legal Standards**

Attorneys' fees may be recovered as costs if the fees are authorized by a contract. (Cal. Civ. Proc., § 1033.5, subd. (a)(1)(A); *Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1108.) Generally, a trial court's decision regarding an attorney's fees award is reviewed for an abuse of discretion. (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 991; *Sonoma Land Trust v. Thompson* (2021) 63 Cal.App.5th 978, 983.) However, where the question is whether a prevailing party is within the scope of an attorneys' fees clause and satisfies the clause's criteria for an award of fees, the trial court's decision is reviewed de novo. (See *Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175.) In determining the scope of an attorneys' fees clause, the traditional rules of contract interpretation apply, and the mutual intent of the parties at the time of contract formation governs. (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 752 (*Mountain Air*); see also *Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 288 (*Hartford*).) The contract will be interpreted with reference to its subject matter and the circumstances of is creation, and the words of the contract will be given their " ' " 'clear and explicit' " ' " meaning and interpreted in their " ' " 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage.' " ' " (*Mountain Air*, at p. 752; *Hartford*, at p. 288; *Travelers Indemnity Co. v. Lara* (2022) 84 Cal.App.5th 1119, 1137; Civ. Code, §§ 1638, 1644, 1647.) If the action is outside the scope of an attorneys' fees clause, there can be no recovery. (*Mountain Air*, at p. 752; *Travelers*, at p. 1137.)

**D. Analysis**

Because this case involves two petitions by Doan, we will discuss Tran's motion for attorneys' fees in relation to the two petitions separately.

### 1. Petition for Ownership

#### a. Indemnity and Reimbursement

As quoted above, Section 12.16 permits a trustee to recover her expenses for actions taken with respect to "trust administration." However, the evidence does not indicate that Tran acted as a trustee or engaged in acts of trust administration with respect to the Ownership Petition.

As part of her closing submission to the trial court, Tran argued that she should not be removed as a trustee because "the Residual Trust has never been funded, and since [Tran] has never actually served as a successor trustee." If Tran has never actually served as a trustee, then her actions in opposing the Ownership Petition could not have been an act of administration. Further, since the Residual and Marital Sub-Trusts for which Tran is a co-trustee were not yet funded and thus, not in existence (Fraser et al., DCRT (Cont.Ed.Bar September 2024 supp.) § 5.3), Tran did not have a sufficient ability to act as those Sub-Trusts' trustee. In fact, because only the Administrative Trust was active, and it was the Administrative Trust that was to gather assets and distribute them among the Sub-Trusts, Tran could not have acted as a trustee on behalf of a valid and existent Sub-Trust by opposing the Ownership Petition. Finally, and relatedly, Doan brought the Ownership Petition in his capacity as the only trustee for the Administrative Trust. It is unclear how opposing the only active trustee of the Trust and attempting to keep what appears to be Tran's individual property outside of the Administrative Trust can be considered "trust administration" by Tran on behalf of the Marital and Residual Sub-Trusts. Indeed, because Doan was the only trustee who could act on behalf of the Trust, Tran's opposition to the Ownership Petition must have been in an individual capacity and could not have been "trust administration."

For these reasons, we conclude that Tran was not acting as a trustee or engaging in trust administration by opposing the Ownership Petition. Therefore, the trial court correctly found that Tran was not entitled to fees and costs under Section 12.16.

41.

### b. No Contest Expenses

"Although no contest clauses are enforceable and favored by the public policies of discouraging litigation and preserving the transferor's intent, they are nevertheless strictly construed and may not be extended beyond their plainly intended function." (*Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 604; see *Burch v. George* (1994) 7 Cal.4th 246, 254.) Whether there has been a "contest" under a particular "no contest clause" depends on the language of the clause and the circumstances of the case. (*Johnson*, at p. 604; *Burch*, at p. 254.) Here, the trial court concluded that Doan's Ownership Petition was not a "contest" for purposes of Sections 14.12 and 14.13 and that Tran had not acted as a Trustee. We agree.

First, for the reasons explained above, Tran was not acting as the trustee of the Marital and Residual Sub-Trusts or the Administrative Trust when she opposed the Ownership Petition. Because she was not acting and could not act as a trustee in opposing the Ownership Petition, Tran was not "[t]he Settlor's … Trustee serving under the Trust" in relation to the Ownership Petition for purposes of Section 14.13. Further, the attorneys' fees described in Section 14.13 are recoverable if they are "expenses incurred by the Trustee." Again, because Tran was not and could not have been acting as "[the] Trustee" in opposing the Ownership Petition, her expenses are not "expenses incurred by the Trustee" under Section 14.13.

Second, Section 14.12 contained an exclusion from the definition of "contest"/"contestant." In relevant part, Section 14.12 excluded actions by trustees to confirm ownership of settlors' property in the trust. Doan's ownership petition fits within this exclusion. Doan brought the petition in his capacity as the Administrative Trust's trustee. Further, the petition clearly seeks to confirm ownership of the 5 PODAs to the Administrative Trust through operation of the Aggregate Agreement. Finally, the 5 PODAs were community property. Therefore, the petition is an action brought by a trustee to confirm ownership of the settlors' property into the trust. Because this

42.

exclusion applies, the ownership petition is not a "contest" and Doan is not a "contestant" under Section 14.12.

Third, this case does not involve an obvious attack against any aspect of the Trust. The Ownership Petition was initiated so that assets that were not under the Trust's control, but that had apparently passed outside the reach of the Trust, could be recovered and become Trust assets. This action was not initiated so that Doan could take any Trust assets away from the Trust or to challenge how the Trust provided for the disposition or division of a Trust asset. Indeed, if Doan had been successful, the Trust would have benefited because its assets would have increased.

Tran argues in part that the Ownership Petition contested and impaired the exclusionary clauses of Schedule A and the Assignment, which excluded pay-on-death accounts as assets transferred to the Trust. However, Doan has not argued that the exclusionary clauses are invalid, nor has he argued that the 5 PODAs became Trust assets as of the October 6, 2017 signing date, notwithstanding the exclusionary clauses. The fact that the 5 PODAs did not become Trust assets on October 6, 2017, does not preclude the possibility that they later became Trust assets through other mechanisms. In fact, it is Doan's position that after Pham died the 5 PODAs became Trust assets through the Aggregate Agreement. Therefore, the Ownership Petition does not contest or impair the pay-on-death exclusionary clauses of Schedule A or the Assignment.

In sum, the trial court correctly concluded that Tran is not entitled to attorneys' fees under Sections 14.12 and 14.13 for successfully opposing the Ownership Petition.

### 2. Petition for Removal

#### a. No Contest Expenses

Absent a specific provision that prohibits challenges to a trustee, an action to remove a trustee is not considered a "contest" for purposes of a "no contest clause." (*Fazzi v. Klein* (2010) 190 Cal.App.4th 1280, 1288–1289.) Further, even if a provision prohibits challenges to a trustee, some challenges (such as non-frivolous challenges based

on breaches of fiduciary duty) will not be deemed a contest because following such a prohibition would violate public policy. (*Dae*, *supra*, 69 Cal.App.5th at pp. 462–464; *Fazzi v. Klein*, at p. 1289.)

Here, we are unaware of any specific provision in the Trust that prohibits challenges to a trustee's actions or otherwise limits the ability of a beneficiary to seek the removal of a trustee. Moreover, the basis for the Removal Petition was a fear that Tran harbored such animosity towards him that she would be unable to fulfill her duties (both fiduciary and express) as a trustee. While Doan did not allege that Tran has actually failed to properly administer a Sub-Trust or engaged in any acts as a trustee that constituted a breach of fiduciary duty, Doan's allegations are clearly related to Tran's ability to act in a fiduciary capacity. As indicated above, Tran has expressed beliefs and suspicions about Doan and his conduct towards Pham and Anjolie and that are very serious, if not criminal. Given Tran's testimony, Doan's petition was not frivolous.

Accordingly, because no provision of the Trust prohibits challenges to or removals of a trustee, and in any event because Doan's petition was non-frivolous and related to Tran's ability to act as a fiduciary, we conclude that Doan's petition for removal is not a "contest" for purposes of the "no contest clause." (*Dae*, *supra*, 69 Cal.App.5th at pp. 462–464; *Fazzi v. Klein*, *supra*, 190 Cal.App.4th at pp. 1288–1289.) Therefore, the trial court correctly concluded that Tran was not entitled to attorneys' fees under the Section 14.12 and Section 14.13 no contest provisions.

### b. Indemnity and Reimbursement

### i. Trust Administration

At the conclusion of trial, because the Administrative Trust was still in the process of gathering assets, the Marital and Residual Sub-Trusts had yet to be funded and thus, were not active or in existence. (Fraser et al., DCRT (Cont.Ed.Bar September 2024 supp.) § 5.3 ["If a trust document is executed but no property is immediately made subject to the trust, the trust will come into existence when the property is later

44.

transferred to the trust."].)  Since the Marital and Residual Sub-Trusts were not funded or existent, Tran could not engage in affirmative acts of trust administration, such as making distributions, investments, and other acts of management.  Nevertheless, Tran is expressly identified as one of the co-trustees of the Marital and Residual Sub-Trusts.  As an expressly named or nominated trustee, we believe Tran has the inherent authority to engage in at least one narrow act of trust administration.  We believe that an expressly named or nominated trustee of a trust that has not yet been funded has the inherent ability to defend her position as a trustee and resist preemptive removal efforts.

Although not a traditional or affirmative act of trust administration, it is an act that is entirely consistent with the express provisions of a trust and thus, within the clear intent of the settlors.  By naming a specific trustee, settlors clearly intend for that person to not only follow the express provisions and obligations of a trust, but also to exercise their unique discretion where appropriate.  Ensuring that the settlors' choice for trustee is able to remain a trustee in the first instance and before the trust becomes existent is a fundamental and antecedent act of trust administration.  If we were to prohibit a nominated trustee such as Tran from obtaining reimbursement for successfully opposing an attempt to remove her as a trustee before she could engage in any acts of affirmative trust management, we would be providing a mighty disincentive for otherwise willing trustees to serve.  Specifically, if a named trustee knows that she will have to expend her own funds for attorneys' fees, and will not get reimbursed for those fees even if she wins, there is a great incentive to simply resign.  Denying attorneys' fees to a trustee who successfully opposes removal would give unscrupulous beneficiaries a perverse ability to thwart the settlors' intent through the threat of litigation costs.

Additionally, had Doan filed the Removal Petition after the Marital and Residual Sub-Trusts had been funded, there is no question that Tran's successful opposition would constitute an act of trust administration.  A "trustee who successfully defends themselves from a removal action is entitled to reasonable attorney fees from the trust," because the

45.

trustee's defense is "administration of the trust." (Baer et al., CTPL (Cont.Ed.Bar March 2025 supp.) § 14.32; see also *Wells Fargo Bank v. Superior Court* (2000) 22 Cal.4th 201, 213 ["[A] trustee … may recover attorney fees and costs incurred in successfully defending against claims by beneficiaries."]; *Estate of Gump* (1991) 1 Cal.App.4th 582, 604 ["It is established that attorney fees and litigation costs incurred in the trustee's *successful defense* of an action brought by the beneficiary are recoverable."].) If a trustee of a funded trust who successfully defends against a removal action has engaged in an act of trust administration, we detect no reason why the same should not also hold true to an expressly named/nominated trustee who successfully defends against a removal action before the trust is funded. In both instances, the trustee and the nominated trustee have defended their position and the ability of the trust to function through them, as intended by the settlor.

Given these considerations, we conclude that Tran engaged in one narrow act of "trust administration" as a trustee when she successfully opposed the Removal Petition. (Cf. Baer et al., CTPL (Cont.Ed.Bar March 2025 supp.) § 14.32; cf. also *Wells Fargo Bank*, *supra*, 22 Cal.4th at p. 213; *Estate of Gump*, *supra*, 1 Cal.App.4th at p. 604.)

### ii. Judicial Estoppel

The trial court concluded that Tran was judicially estopped from arguing that she was a trustee. Judicial estoppel generally applies when: " '(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.' " (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986–987.) We are not satisfied that judicial estoppel was appropriately applied.

Tran's statement that she never actually served as a trustee is not "totally inconsistent" with her attempt to obtain indemnification for her acts of trust

administration. Tran's statement was made in the context of explaining that she had not had an opportunity to engage in affirmative acts of trust administration. That is, she had engaged in no acts of trust administration that could be viewed and considered to see if her alleged hostility towards Doan had impaired a Sub-Trust. Tran was not denying that she is a designated or nominated co-trustee of the Marital and Residual Sub-Trusts, nor was she saying that she would refuse to serve as a co-trustee. Simply explaining that one has not actively administered a trust is not the same as denying one's status as a trustee. Further, Tran's point that Doan's argument was speculative was accepted by the trial court. Whether Tran was engaged in acts of trust administration by simply opposing the petition to remove her as trustee in no way affects or undermines the argument that Tran had not managed or made distributions from any Sub-Trust, or that Doan's argument was speculative in terms of what Tran might do as a co-trustee once the Sub-Trusts were funded. Given the context in which Tran's statement was made, the third element of judicial estoppel was not met.

Additionally, judicial estoppel is an equitable doctrine, which means that additional circumstances and considerations may warrant a refusal to apply judicial estoppel even if all of the elements are met. (*Miyahara v. Wells Fargo Bank, N.A.* (2024) 99 Cal.App.5th 687, 697–698.) Here, there is no dispute that Tran is named as a co-trustee of the Marital and Residual Sub-Trusts. Once those trusts are funded and active, Tran may manage and engage in the full range of trust administration and management as a co-trustee. Further, the parties have cited no cases, and we are aware of none, in which a court was called upon to determine whether a nominated trustee to an unfunded trust that successfully defeated a removal petition was precluded from recovering attorneys' fees as part of a reimbursement clause. Given the fact that all parties know and understand that Tran is the named and nominated co-trustee of the Marital and Residual Sub-Trusts, and that the entitlement of attorneys' fees as reimbursement in this context

appears to be unique, equitable considerations strongly counsel against application of judicial estoppel in connection to Tran's successful opposition to the Removal Petition.

For these reasons, we conclude that the trial court erred by finding that Tran was judicially estopped from utilizing Section 12.16.

### iii. Attorneys' Fees Cannot Be Granted Now

Section 12.16 provides for indemnification and reimbursement of costs incurred by a trustee for acts of "trust administration." We have determined that Tran's successful opposition to the Removal Petition constitutes a narrow type of "trust administration." However, even though Tran has engaged in "trust administration," her ability to receive reimbursement is limited. Section 12.16 allows reimbursement "from the Trust Estate of which that person serves as Trustee." Tran is a trustee only for the Martial and Residual Sub-Trusts. She is not a trustee for the Trust as a whole, the Administrative Trust, or the Survivor Sub-Trust. Therefore, pursuant to the plain language of Section 12.16, (*Zahnleuter*, *supra*, 88 Cal.App.5th at p. 1305), Tran's reimbursement for attorneys' fees may only be paid by the Marital Sub-Trust and/or the Residual Sub-Trust. Section 12.16 does not operate to permit Tran to recover from the Trust as a whole, the Administrative Trust, the Survivor Sub-Trust, or Doan individually in any way.[7] (*Ibid.*)

---

[7] Tran argues that Civil Code section 1717 entitles her to fees under Section 12.16. However, Civil Code section 1717 provides for reciprocal attorneys' fees where the contract provides for such fees "incurred to enforce [the] contract" to the prevailing party. (Civ. Code, § 1717, subd. (a).) Section 12.16 merely provides for reimbursement and indemnification to a trustee for "trust administration" expenses, it does not provide for "attorneys' fees" for prevailing in a contract action. Moreover, we have concluded that Tran engaged in a limited act of trust administration by opposing the Removal Petition. Thus, she falls squarely within the plain language of Section 12.16, irrespective of Civil Code section 1717. Finally, even if Civil Code section 1717 applies in this case, that section would also make any limitations within Section 12.16 applicable to Tran. (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 130.) Section 12.16 limits the source for payment of attorneys' fees to a particular trust, and in Tran's case, neither of the Sub-Trusts for which she is the trustee is in existence. (Fraser et al., DCRT (Cont.Ed.Bar September 2024 supp.) § 5.3.) For these reasons, we cannot conclude that

It is the limited nature of the reimbursement clause that presents a problem in this case. Again, at the time the trial court ruled on Tran's fee motion, the Marital and Residual Sub-Trusts were unfunded and non-existent because the Administrative Trust was still attempting to collect assets, and it is the Administrative Trust that funds the Survivor, Marital, and Residual Sub-Trusts. "If a trust document is executed but no property is immediately made subject to the trust, the trust will come into existence when the property is later transferred to the trust." (Fraser et al., DCRT (Cont.Ed.Bar September 2024 supp.) § 5.3.) Since the Marital and Residual Sub-Trusts are non-existent, they cannot reimburse Tran for any expenses. In other words, without funds or "trust property," the Martial and Residual Sub-Trusts do not sufficiently "exist" to reimburse their trustee for the expense of any administrative activity.[8] As a result, only when the Marital and Residual Sub-Trusts are funded may Tran seek reimbursement from those Sub-Trusts for the reasonable attorneys' fees she incurred to defeat the Removal Petition.[9] (Cf. *ibid*; Baer et al., CTPL (Cont.Ed.Bar March 2025 supp.) § 14.32.) Because the Marital and Residual Sub-Trusts are unfunded and nonexistent, Tran's fee motion was premature and thus, improper.

In light of the above, we must disagree with the court's rationale for denying Tran's motion for attorney's fees with respect to the Removal Petition. Nevertheless, the plain language of Section 12.16 and the status of the Sub-Trusts at the time the court

---

Civil Code section 1717 has application to this case or would change the outcome of this appeal.

[8] The essential elements of a valid trust are: (1) a trust intent; (2) trust property; (3) trust purpose; and (4) a beneficiary. (*Dudek v. Dudek* (2019) 34 Cal.App.5th 154, 164.)

[9] Nothing in this opinion precludes Tran from seeking reimbursement from the Marital and Residual Sub-Trusts for opposing the Removal Petition once those Sub-Trusts are funded. Because we have determined that successfully opposing the Removal Petition (but not the Ownership Petition) is a limited form of trust administration, the key issue will be how much reimbursement she is entitled to.

ruled demonstrate that Tran's attempt to obtain reimbursement was premature. Therefore, we agree with the court's ultimate disposition and conclude that the court correctly denied Tran's motion for attorneys' fees.

## DISPOSITION

The trial court's finding that Doan waived his community property interest in the five bank accounts is reversed. The court's judgments are otherwise affirmed. This matter is remanded back to the probate court for further proceedings consistent with this order. In the interests of justice, the parties will bear their own costs on appeal.

ELLISON, J.[*]

WE CONCUR:

FRANSON, Acting P. J.

PEÑA, J.

---

[*] Retired judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.